The PEOPLE of the State of Colorado, Complainant

v.

David Albert SOLOMON, Respondent.

No. 12PDJ055.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

Feb. 22, 2013.

Attorney Regulation. The Presiding Disciplinary Judge disbarred David Albert Solomon (Attorney Registration Number 03176), effective March 29, 2013. Solomon, who was retained by a bank to handle collection matters, negotiated settlements without his client's consent and converted client funds by ignoring his obligation to hold in trust those settlement payments. Solomon also failed to keep funds belonging to his client separate from his own, failed to promptly deliver to his client property it was entitled to receive, failed provide an accounting regarding his interests in the property, and failed to withdraw from the representation. His misconduct constitutes grounds for the imposition of discipline pursuant to C.R.C.P. 251.5 and violated Colo. RPC 1.2(a), 1.15(a), 1.15(b), 1.15(c), 1.16(a)(3), and 8.4(c).

## OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(c)

On January 16, 2013, the Presiding Disciplinary Judge ("the Court") held a sanctions hearing pursuant to C.R.C.P. 251.15(b). Charles E. Mortimer Jr. appeared on behalf of the Office of Attorney Regulation Counsel ("the People"). David A. Solomon ("Respondent") did not appear. The Court now issues the following "Opinion and Decision Imposing Sanctions Pursuant to C.R.C.P. 251.19(c)."

### I. SUMMARY

The People filed a complaint alleging that Respondent violated numerous Rules of Professional Conduct by knowingly converting client funds, failing to keep client property

separate from his own until an accounting had been completed, failing to deliver funds to his client, failing to provide a full accounting, and failing to abide by his client's decisions regarding the object of the representation. When Respondent did not answer the complaint or otherwise defend, the Court entered default, thereby deeming the alleged misconduct admitted. Given these rule violations, and because the Court is not aware of any factors in mitigation, the Court concludes the appropriate sanction is disbarment.

## II. PROCEDURAL HISTORY

The People filed their complaint in this matter on July 12, 2012. Respondent did not answer the complaint, and the Court granted the People's motion for default on October 23, 2012. Upon the entry of default, the Court deems all facts set forth in the complaint admitted and all rule violations established by clear and convincing evidence.[1]

At the sanctions hearing on January 16, 2013, Respondent did not appear. The People did not call any witnesses, but they introduced exhibits 1 and 2.

## III. ESTABLISHED FACTS AND RULE VIOLATIONS

The Court hereby adopts and incorporates by reference the factual background of this case as fully detailed in the admitted complaint.[2] Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on April 26, 1972, under attorney registration number 03176.[3] He is thus subject to this Court's jurisdiction in these disciplinary proceedings.[4]

### General Allegations

Respondent represented First National Bank of Omaha ("FNBO") in collection matters from around 2000 through June 2009, when FNBO terminated its contract with Respondent. FNBO contracts with the National List of Attorneys to hire collection lawyers, and Respondent was associated with that list. Collections cases were assigned to Respondent on a contingent fee basis of twenty-two percent.

Under their agreement, FNBO's authorization was required before "instituting any proceeding, incurring any expense, making any compromise or granting any extension." Respondent was to remit all collected payments through Brumbaugh & Quandahl ("B & Q"), a Nebraska law firm representing FNBO that spearheads FNBO's debt collection efforts. Likewise, all correspondence in collections matters was to be sent to B & Q.

Acting on behalf of FNBO, B & Q sent Respondent a letter on June 19, 2009, requesting that he remit all debtor payments received to date, submit an accounting, update the status of all his cases, and return all FNBO files to B & Q. Respondent was given until July 20, 2009, to do so, but he did not fully comply. B & Q sent Respondent additional letters on September 24, 2009, and October 19, 2009, informing him that he was no longer authorized to accept payments on behalf of FNBO.

In November 2009, a representative of B & Q physically removed FNBO files from Respondent's office. B & Q then attempted to send letters to all FNBO debtors, requesting that payments be forwarded directly to B & Q. Nevertheless, Respondent remained the point of contact for some debtors.

### Grafton Matter

Respondent filed a collections lawsuit against Timothy and Cheryl Grafton on FNBO's behalf in June 2008. On September 4, 2008, Respondent filed a stipulation with the court indicating that the Graftons had agreed to make payments of $300.00 per month in order to retire their $16,277.74 debt. The Graftons forwarded $300.00 per month to Respondent beginning in October 2008, per their payment plan. Respondent

1. See *People v. Richards*, 748 P.2d 341, 346 (Colo. 1987); C.R.C.P. 251.15(b).

2. See the People's complaint for further detailed findings of fact.

3. Respondent's registered business address is 4950 South Yosemite Street, F2 348, Greenwood Village, Colorado 80111.

4. See C.R.C.P. 251.1(b).

forwarded the Graftons' monthly payments, minus his fees, to B & Q from October 2008 to December 2009.

In about June 2010, eight months after his contract with FNBO had been terminated, Respondent negotiated a $10,000.00 lump sum settlement of the Grafton litigation with Global Client Solutions, a company the Graftons had hired to assist them with their debt. Respondent did not seek prior authorization from B & Q, nor did he notify B & Q of the settlement.

On July 1, 2010, Global Client Solutions issued a check on behalf of the Graftons made payable to Respondent for $7,000.00 as a first installment of the settlement agreement. Respondent deposited the check into his COLTAF account on July 6, 2010. Respondent did not forward any funds to B & Q or FNBO in connection with the Graftons' lump sum payment. On July 15, 2010, the balance in Respondent's COLTAF account dipped to $2,034.08, evidencing the conversion of a substantial portion of these funds.

On July 26, 2010, the Graftons issued a $1,000.00 check to Respondent as a second installment under the settlement agreement. Respondent deposited the check into his COLTAF account on July 29, 2010, but did not forward any of those funds to B & Q. Again, on August 30, 2010, Respondent deposited a $1,000.00 check from the Graftons into his COLTAF account. He did not forward any of those funds to B & Q. And on September 29, 2010, Respondent deposited another $1000.00 check from the Graftons into his COLTAF account without forwarding any of those funds to B & Q. On September 30, 2010, the balance on that account was $551.36. As such, Respondent converted a substantial portion of FNBO's funds from the Grafton account. Respondent filed a satisfaction of judgment in the Grafton civil action on October 5, 2010, but he failed to notify B & Q of the settlement's finalization, and he failed to forward to B & Q any funds associated with the Grafton matter.

On December 10, 2010, Respondent issued a check from his COLTAF account to B & Q in the amount of $8,970.00, which represented the $11,500.00 he collected from the Graftons, minus his $2,530.00 fee. These funds principally came from a $7,739.18 check made payable to State Farm Insurance Company, which Respondent deposited into his COLTAF account around December 3, 2010. The check contained the following language: "State Farm Insurance as Subrogee of Robert Kennedy; Insured: Griffith James … Mail to: David A. Solomon." Respondent wrote the following on the back of the check: "For Deposit Only State Farm Insurance by David A. Solomon."

### Van Natta Matter

In 2006, Respondent filed a collections lawsuit on behalf of FNBO against Susan Van Natta. Respondent entered into a stipulation with Van Natta in September 2006 for $8,630.41 and began collecting $100.00 per month from her. Through March 2010, Respondent forwarded to B & Q most of the monthly amounts collected from Van Natta.

After March 2010, however, Respondent did not forward any payments to B & Q in the Van Natta matter. Thereafter, Van Natta contacted FNBO for information about the balance on her account, at which point B & Q discovered that Respondent had not been forwarding the Van Natta payments. In November 2010, B & Q requested Respondent provide information concerning the Van Natta collection matter. On November 8, 2010, B & Q sent Respondent a letter alleging that Van Natta had paid Respondent $5,400.00 toward her FNBO debt but Respondent had only forwarded $4,300.00 of those funds to B & Q. B & Q therefore demanded that Respondent forward the additional $1,100.00, minus his fees.

Bank records indicate that Van Natta sent Respondent $100.00 each month from April 2010 to October 2010, and Respondent deposited these funds into his COLTAF account. On November 3, 2010, the balance of Respondent's COLTAF account was $117.21, indicating that Respondent failed to hold in trust a substantial portion of FNBO funds associated with the Van Natta collection matter. On November 19, 2010, Respondent issued an $858.00 check to B & Q, indicating on the check that it represented the collection of $1,100.00 from Van Natta, minus Respon-

dent's fee of $242.00. Respondent used funds collected from other matters he was handling to cover the $858.00 check.

## Warning Lites Matter

On behalf of FNBO, Respondent filed a collections action against Warning Lites and Equipment, Inc., Tim Weitzel, and Kirk Knowles in June 2008. Weitzel and Knowles had allegedly personally guaranteed a Visa credit card issued to Warning Lites. The principal amount of the debt was $97,221.85.

Warning Lites was voluntarily dissolved by Weitzel on February 13, 2006. At the time of the voluntary dissolution, Weitzel was Warning Lites' registered agent. He was also listed as the president of Warning Lites on several documents filed with the Colorado Secretary of State. Respondent's process server served the summons and complaint on Warning Lites by handing them to Weitzel's wife. Weitzel and Knowles both filed answers in the collections action contending that Warning Lites had been dissolved and that their signatures on the guaranty of the debt had been forged. Warning Lites failed to file an answer.

On September 23, 2008, Respondent filed a verified motion for default judgment against Warning Lites, which was granted. On October 1, 2008, the court issued an order for entry of default judgment in favor of FNBO and against Warning Lites for $134,309.64, including prejudgment interest and costs. Respondent never made any effort to collect on that judgment. Without B & Q's or FNBO's knowledge or authorization, Respondent settled the $97,221.85 claim with Weitzel and Knowles for $2,000.00.

On September 25, 2008, Respondent entered into a stipulated release and motion to dismiss with Weitzel and Knowles. The court granted the motion and dismissed Weitzel and Knowles from the lawsuit with prejudice. The same day, Respondent deposited a $2,000.00 cashier's check into his COLTAF account. The check contained the following language: "First National Bank of Omaha Re: Tim Weitzel and Kirk Knowles—08CV639." Although he did not have authorization to do so, Respondent endorsed the back of the check as follows: "First National Bank of Omaha by David A. Solomon."

In January 2009, B & Q began to inquire about the status of the Warning Lites collection, but Respondent did not respond. Respondent's repeated failure to respond to requests for information in a number of different collection cases, including the Warning Lites matter, caused FNBO to terminate his services. On June 19, 2009, B & Q sent Respondent a letter requesting he remit to B & Q all debtor payments regarding all FNBO matters and provide a complete accounting for each claim, along with a status report on all ongoing actions by July 20, 2009. Respondent was directed to close and return all FNBO files he held to B & Q.

Respondent did not send B & Q any funds associated with the Weitzel and Knowles settlement until July 29, 2009, when he sent B & Q a $1,560.00 check, which represented the $2,000.00 he collected, minus his attorney's fee. He failed to disclose to B & Q or FNBO at that time that he had settled the Warning Lites debt for $2,000.00, despite the fact that he had been directed to submit an extensive status report on all cases. B & Q hired another Colorado collections firm to pursue collection of the Warning Lites debt.

In handling FNBO collections, Respondent violated Colo. RPC 1.2(a) (failing to abide by the client's decision concerning the object of the representation and failing to consult with the client as to the means by which the object is to be pursued); Colo. RPC 1.15(a) (failing to keep funds belonging to his client separate from his own); Colo. RPC 1.15(b) (failing to promptly deliver to his client funds that the client was entitled to receive, and failing to render a full accounting regarding client property); Colo. RPC 1.15(c) (failing to keep his client's property separate until providing an accounting regarding his interests in the property); Colo. RPC 1.16(a)(3) (failing to withdraw from his client's representation after termination of the relationship); and Colo. RPC 8.4(c) (knowingly converting funds belonging to his client, constituting conduct involving dishonesty).

## IV. SANCTIONS

▬▬ The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp. 1992) ("ABA *Standards*") and Colorado Supreme Court case law guide the imposition of sanctions for lawyer misconduct.[5] In imposing a sanction after a finding of lawyer misconduct, the Court must consider the duty violated, the lawyer's mental state, the actual or potential injury caused by the lawyer's misconduct, and any aggravating and mitigating evidence.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* Respondent violated duties to his client, FNBO, to preserve its property, to diligently respond to its requests for accounting, to be candid and truthful, and to abide by his client's decisions during the course of the representation.

*Mental State:* The People's complaint, the allegations of which have been deemed admitted by the entry of default, explicitly establishes that Respondent knowingly converted client funds. Respondent also knowingly failed to provide FNBO an accounting when requested to do so, knowingly mishandled client funds, and knowingly declined to consult with FNBO concerning settlement of the Grafton and Warning Lites matters.

*Injury:* Respondent caused FNBO serious financial harm by converting its funds and settling matters without its knowledge or approval. Further, his failure to respond to FNBO's request for an accounting hindered FNBO's ability to manage its collections practice.

### ABA *Standards* 4.0–7.0—Presumptive Sanction

Under the ABA *Standards,* the presumptive sanction for Respondent's misconduct is disbarment. ABA *Standard* 4.11 provides that disbarment is appropriate when a lawyer knowingly converts client property and thereby causes injury or potential injury to the client.

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

▬▬ Aggravating circumstances are considerations or factors that may justify an increase in the degree of discipline to be imposed, while mitigating circumstances may justify a reduction in the severity of the sanction.[6] The Court considers evidence of the following aggravating circumstances in deciding the appropriate sanction, but because Respondent failed to appear or otherwise defend himself in this matter, the Court is aware of no factors in mitigation.

*Prior Disciplinary Offenses—9.22(a):* In 2005, Respondent was suspended for six months, all stayed pending completion of a one-year period of probation, for neglecting a client matter, failing to communicate with his client, and failing to protect his client's interests at the time Respondent effectively terminated the representation.[7]

*Dishonest or Selfish Motive—9.22(b):* Respondent's knowing conversion of FNBO's client funds warrants an inference that his motives were both dishonest and selfish, fueled by a desire for pecuniary gain.

*Pattern of Misconduct—9.22(c):* During the same general timeframe, Respondent engaged in similar misconduct in several matters he handled for FNBO—including failure to account for funds and knowing conversion—thereby demonstrating a nascent pattern of misconduct.[8] The Court also takes into account Respondent's neglect and mishandling of an earlier client matter, which suggests an emerging and disconcerting trend of disregarding client needs and objectives.

*Multiple Offenses—9.22(d):* The People's complaint establishes several distinct types of misconduct, ranging from dishonesty to failure to provide an accounting.

*Substantial Experience in the Practice of Law—9.22(i):* Respondent was admitted to

---

5.  *See In re Roose,* 69 P.3d 43, 46–47 (Colo.2003).

6.  *See* ABA *Standards* 9.21 & 9.31.

7.  *See* Ex. 2.

8.  *See In re Reardon,* 759 A.2d 568, 577 (Del.2000) ("A pattern may be discerned from two or more recognizably consistent acts that serve as a predictor of future misconduct.").

the Colorado bar in 1972 and thus has had substantial experience in the practice of law.

### Analysis Under ABA *Standards* and Colorado Case Law

■ ABA *Standard* 4.11 provides that disbarment is the presumptive sanction in this matter, and the People seek imposition of that sanction. Colorado cases also support disbarment for knowing conversion of client funds. The Colorado Supreme Court has made clear that, "[i]n situations where a lawyer knowingly misappropriates client funds, the appropriate sanction is typically disbarment."[9] Where, as here, conversion of client funds is coupled with other rule violations, the Colorado Supreme Court has had no difficulty concluding that disbarment is warranted.[10]

Here, Respondent engaged in knowing conversion of FNBO's funds in the Grafton, Van Natta, and Warning Lites matters. In each of these matters, Respondent's conduct caused FNBO injury or serious injury. In none of these matters is any mitigation present, while five circumstances in aggravation exist. As such, the ABA *Standards* and Colorado case law call for Respondent's disbarment, and the Court concurs, finding in its discretion that disbarment is appropriate in light of the several instances of Respondent's conversion and other misconduct and the absence of any mitigating factors.

### V. *CONCLUSION*

Disbarment is clearly the appropriate sanction in this matter. Respondent knowingly converted client funds and engaged in

other rule violations, and no factors mitigate his misconduct.

### VI. *ORDER*

The Court therefore **ORDERS:**

1. **DAVID ALBERT SOLOMON,** attorney registration number 03176, is **DISBARRED.** The **DISBARMENT SHALL** take effect only upon issuance of an "Order and Notice of Disbarment."[11]

2. Respondent **SHALL** file any post-hearing motion or application for stay pending appeal with the Court **on or before Thursday, March 13, 2013.** No extensions of time will be granted. If Respondent files a post-hearing motion or an application for stay pending appeal, the People **SHALL** file any response thereto within seven days, unless otherwise ordered by the Court.

3. Respondent **SHALL** pay the costs of these proceedings. The People **SHALL** submit a "Statement of Costs" within fourteen days from the date of this order. Respondent's response to the People's statement, if any, must be filed no later than fourteen days thereafter.

4. Respondent **SHALL** file with the Court, within fourteen days of the effective date of the disbarment, an affidavit complying with C.R.C.P. 251.28(d).

---

9. *In re Haines*, 177 P.3d 1239, 1250 (Colo.2008); *see also In re Cleland*, 2 P.3d 700, 703 (Colo. 2000) (holding that the presumed sanction for knowing misappropriation of client funds is disbarment); *People v. Varallo*, 913 P.2d 1, 10–11 (Colo.1996) (ruling that lawyers are "almost invariably disbarred" for knowing conversion of client funds, regardless of whether the lawyer intended to permanently deprive the client of those funds); *cf. In re Fischer*, 89 P.3d 817, 822 (Colo.2004) (noting that mitigating factors may warrant a departure from a presumption of disbarment in some cases).

10. *See People v. Hindman*, 958 P.2d 463, 464 (Colo.1998) (disbarring lawyer for knowingly converting client property, neglecting a legal

matter, failing to keep his client informed, and failing to return records and equipment to his client); *accord* ABA *Standards* § II at 7 ("The ultimate sanction imposed should at least be consistent with the sanction for the most serious instance of misconduct among a number of violations; it might well be and generally should be greater than the sanction for the most serious misconduct.").

11. In general, an order and notice of sanction will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.