**In the Matter of Susan G. HAINES, Attorney–Respondent.**

No. 06SA146.

Supreme Court of Colorado, En Banc.

Feb. 25, 2008.

·Moye White LLP, Eric B. Liebman, Denver, Colorado, Attorneys for Appellant–Respondent Susan G. Haines.

John S. Gleason, Regulation Counsel, Kim Ikeler, Assistant Regulation Counsel, Denver, Colorado, Attorneys for Appellee–Petitioner Office of Attorney Regulation Counsel.

Justice HOBBS delivered the Opinion of the Court.

Respondent, Susan G. Haines, appeals the decision of the Hearing Board in this attorney regulation proceeding.[1] The Hearing Board determined that Haines violated several provisions of the Colorado Rules of Professional Conduct, most significantly that she knowingly misappropriated funds belonging to her client, the Edouart estate, in violation of Colo. RPC 8.4(c) (conduct involving dishonesty, fraud, deceit or misrepresentation, including knowing conversion). The Hearing Board also determined that Haines violated Colo. RPC 1.4(b) (failure to adequately explain a matter to a client) and Colo. RPC 1.15(a), (c) & (f)(1) (failure to keep disputed money separate). Examining factors appli-

---

1. Haines raises the following issues on appeal: (1) the Hearing Board erred by failing to apply the proper burden of proof; (2) the Hearing Board erred by failing to consider alleged ethical breaches by Haines's litigation co-counsel; (3) the Hearing Board erred by viewing a videotaped deposition prior to the hearing and outside the presence of counsel; (4) the Hearing Board erred by failing to consider the testimony of Haines's expert witnesses; and (5) the Hearing Board improperly applied Colo. RPC 1.15(c) to the facts of this case.

cable to the appropriate level of sanction, the Hearing Board imposed disbarment.

Substantial evidence in the record supports the Hearing Board's findings of fact and conclusions of law, including clear and convincing evidence that Haines: (1) knowingly misappropriated $70,000 belonging to her client estate deriving from a litigation settlement, which amount the personal representative and her co-counsel intended would be available to fund costs for additional litigation on behalf of the estate, and (2) lied in the Hearing Board proceedings that she had authorization to take this amount. We affirm the Hearing Board's order disbarring Haines and ordering her to pay restitution to the estate and the costs of the proceedings. However, we reduce the amount of restitution to $65,000 in recognition of the personal representative's testimony that he had authorized the Haines firm to pay itself a minor amount in fees, approximately $5,000.

We disapprove of the Hearing Board's conclusion that Haines knowingly misappropriated money belonging to her litigation co-counsel, Michael T. Mihm. Although Haines acted deceitfully towards Mihm, he had agreed with the personal representative to defer payment of his portion of the contingency fee in favor of the entire settlement proceeds being deposited into the estate account. Thus, the money she took belonged to the estate, not Mihm.

## I.

Haines received a license to practice law in Colorado on October 30, 1984. She is subject to our jurisdiction pursuant to C.R.C.P. 251.1(b).

Haines represented the Dorothy Edouart estate. The estate's personal representative was John Erpelding, an experienced attorney who practiced probate law in California for nearly fifty years and agreed to serve as the personal representative after Haines assured him that her firm would perform all administrative work. Erpelding was in poor health and died while the disciplinary proceedings in this case were being pursued.

As fiduciaries of the estate, Haines and Erpelding were responsible for identifying and marshaling estate assets, including any potential litigation claims. They identified possible fraud and undue influence claims against Howard Zwick, Edouart's son, and Laurent Rousseau, Zwick's attorney. They also identified possible malpractice claims against Edouart's former attorney, Susan Chenault.

Haines and Erpelding agreed that any fees for administrative work completed by Haines's firm for the benefit of the estate would be compensated on an hourly basis. Litigation fees and costs would be subject to a contingency fee agreement.

In 2001, the estate hired Mihm of Kennedy & Christopher, P.C. to act as lead litigation counsel. The contingency fee agreement between Mihm and the estate provided that one-third of the gross recovery to the estate from litigation, resulting from the collection of a judgment or payment of a settlement, would be shared between Haines's law firm and Kennedy & Christopher, based upon the relative proportion of the litigation work conducted by the two firms. The contingency fee agreement also made the estate liable for the payment of costs of litigation.

In early December of 2002, the estate settled certain claims brought in a Florida federal district court against Chenault. Mihm and Erpelding were together in Florida for the litigation when the parties agreed to settle for $200,000. They both talked with Haines over the phone, informing her of the settlement.

Under the contingency fee agreement, Mihm would have been entitled to approximately $63,000 in fees from the settlement funds, while Haines would have been entitled to $4,000 in fees.[2] After agreeing to the settlement, Mihm and Erpelding discussed a proposal whereby Mihm agreed to defer his portion of the contingent fee in the interest of pursuing additional litigation against Zwick and Rousseau in Rhode Island and an appeal in Florida. However, Mihm wanted payment of the litigation costs advanced by

2. It is undisputed that Mihm's firm completed approximately 95% of the litigation-related work and that Haines's firm completed approximately 5% of the work.

his firm in the Florida litigation for which the estate had no ability to pay while the litigation was proceeding.

Erpelding agreed to this proposal. Mihm then explained his proposal for distribution of the settlement proceeds to Haines and John Campbell, a shareholder of Haines's firm, during a December 19, 2002 meeting that focused mainly on strategy for additional litigation in Rhode Island and Florida. Mihm subsequently memorialized this discussion in a letter dated the same day. Erpelding received this letter and, in a phone conversation on December 23 with Campbell, Erpelding stated his authorization for payment of Mihm's costs from estate funds, with the understanding that the entire $200,000 from the settlement would be deposited into the estate account. Erpelding did not authorize Haines, Campbell, or any other person to withdraw $70,000 from the estate account to pay Haines's firm for fees.

In the December 23 phone call, Erpelding recalled Campbell mentioning payment of fees to Haines's firm, but assumed that Campbell was talking about a small amount that would be calculated on the basis of the estate's assets, as provided by California probate law. He expected that the amount would be around $5,000. Erpelding testified that neither Haines nor Campbell informed him that Colorado law allowed the payment of estate administration fees by a personal representative in a larger amount, without court approval.

What occurred between December 19 and December 31, 2002 and led to this disciplinary proceeding was disputed in a lengthy Hearing Board proceeding. On December 19, 2002, Mihm, Haines, and others met for more than four hours, without Erpelding, to discuss future litigation strategies, as well as the disbursement of the $200,000 in settlement funds. At the time of this meeting, the estate owed both Mihm and Haines significant legal fees. Mihm had logged approximately $500,000 in fees directly related to the Florida litigation and had advanced costs to pursue the litigation.[3] Haines's firm had

logged nearly $100,000 for administrative work done on behalf of the estate. Most of this administrative work had been completed prior to the hiring of Mihm, was unrelated to the litigation, and was to be billed on an hourly basis.

The Hearing Board found that, during the December 19 meeting, Haines considered an alternative distribution scheme for the settlement funds that would have her firm being paid $70,000 once the settlement check was deposited into the estate's account. Based on Mihm's testimony, and that of an associate of his firm, the Hearing Board found that Haines did not announce this intention at the December 19 meeting or at a subsequent meeting between Haines and Mihm on December 30. Instead, she kept silent.

Haines testified that she had mentioned the $70,000 amount during the December 19 meeting. She pointed to notes she had made at the meeting with the amounts $70,000, $84,000 and $25,000 written on them. Ingrid Vinci, an associate of Mihm's, who transcribed Haines's notes of the meeting for everyone in attendance, stated that Haines's handwritten notes did not contain these figures, suggesting that Haines had added these figures to the back side of the original page of notes at some later time.

Haines testified that she had a phone conversation with Erpelding around December 22 in which she informed him of her intent to pay her firm $70,000. Erpelding denied that she had such a conversation with him. Campbell testified that Haines had mentioned the $70,000 amount at the December 19 meeting. The Hearing Board found Erpelding and Mihm's testimony to be credible and that neither Haines nor Campbell had obtained authorization from Erpelding or Mihm to withdraw $70,000 from the estate account.

On December 30, Mihm and Haines met again to discuss litigation strategy. Haines did not mention to Mihm that she intended to withdraw $70,000 from the estate account upon deposit of the settlement proceeds.

---

3. In his letter of December 19, 2002, Mihm stated that his costs to date were $89,648.29, with more "trickling in." The costs eventually turned out to be approximately $140,000. Haines's memory of Mihm's request for payment of costs at the December 19 meeting was for $84,000.

Mihm received the settlement check and endorsed it for deposit to the estate's bank account on December 31. That same day, Haines's employee picked up the settlement check from Mihm and deposited it into the estate's bank account. Haines drafted two checks—one for $37,000 and the other for $33,000. The check for $37,000 bears Haines's notation "probate fees & costs— Eduoart Estate." The check for $33,000 bears Haines's notation "Probate fees & Costs in Chenault Litigation." The deposit ticket into Haines's firm's operating account reads: "Edouart estate $37,000" and "Conting. $33,000." Both checks were deposited and negotiated on December 31, 2002. Immediately prior to the deposit of the settlement check, the estate's account had a balance of approximately $800.

Haines also drafted two checks for Mihm: an $84,000 check made out to Kennedy & Christopher for litigation costs, and a separate check for $25,000 to hire trial counsel in Rhode Island. In all, the checks drafted by Haines totaled $179,000. If all of the checks drafted by Haines had been cashed, the estate would have had remaining cash assets of less than $22,000.

In early January 2003, Mihm learned that Zwick intended to file a motion in the probate court to limit the disbursement of the settlement proceeds from the estate account. Concerned about withdrawing a large amount of money from the estate before the court ruled on this motion, Mihm did not cash either check. He held the $84,000 check and returned the $25,000 check to Haines as he had not asked for that amount. In early January of 2003, Haines negotiated another check against the estate funds for $2,000 to pay an outside attorney, Michael Gross, for an ethics consultation.

Erpelding testified in his deposition that he had not authorized Haines to withdraw the $70,000 amount, the $25,000 amount, or the $2,000 amount. Nor did he recall authorizing Haines to take a contingency fee amount. At most, he authorized the Haines firm to withdraw a minor amount of estate fees that he thought would amount to no more than $5,000.

On January 14, 2003, District Judge John P. Leopold in his probate court capacity ordered that "the Personal Representative make no distributions, other than those necessary to maintain the integrity of the estate."

In May 2003, Mihm and Erpelding, having learned of Haines's $70,000 withdrawal, asked Haines to return the money to the estate account. She did not do so. Mihm then filed a complaint with the Office of Attorney Regulation, resulting in the Hearing Board's judgment in this case.

The Hearing Board found that Haines lied in her testimony that she had received authorization from Erpelding or Mihm to withdraw $70,000. It determined that she knowingly misappropriated funds of the estate and of Mihm.

The Hearing Board determined that neither Mihm nor Erpelding would have agreed to Haines's request to make such a withdrawal. The Board reasoned that, based on his agreement with Erpelding, Mihm was merely deferring payment to himself of the $63,000 that he had earned under the contingency fee agreement, in favor of funding costs for additional litigation on behalf of the estate. Thus, the Board concluded that Mihm would not have given permission for Haines to take such a substantial withdrawal and that Haines's testimony on this subject was false.

The Hearing Board's decision states in part as follows:

The Hearing Board carefully considered Respondent's testimony that Mihm and Erpelding specifically approved her taking $70,000 and finds this testimony to be false. The facts and circumstances show by clear and convincing evidence that neither Mihm nor Erpelding would have approved Respondent taking $70,000.

The Hearing Board's judgment includes these mixed factual and legal findings and conclusions:

1. [Haines] violated [Colo. RPC] 1.4(b) when she failed to fully explain to Erpelding the effect on the Estate of her withdrawal of $70,000 in administration fees from the Estate's account, which

monies were subject to the contingent fee agreement. The conduct precluded Erpelding from making an informed decision on the best interests of the Estate.

2. [Haines] violated [Colo. RPC] 1.15(a) and (c) when she failed to keep property belonging to Mihm, his fees and costs, separate from her operating account, until the completion of an accounting and severance of the amounts due to Mihm, the Estate, and [Haines].

3. *[Haines] violated [Colo. RPC] 8.4(c) by engaging in conduct involving deceit and misappropriating funds belonging to the Estate and Mihm.* [Haines] had a right to no more than 5% of the $66,666 in attorney fees from the $200,000 settlement. Without giving Mihm or her client notice, [Haines] unilaterally took substantially more than the amount due to her firm under the contingency agreement. *[Haines] acted deceitfully when she took funds without notice and without consent from Mihm and Erpelding.* Without such consent, the settlement proceeds should have been shared as set forth in the written fee agreement.

4. [Haines] violated [Colo. RPC] 1.15(a) and (f)(1) when she failed to hold property of a client separate from her own property. The contingency fee agreement provided [Haines] a right to fees earned in the litigation, but by taking money from the Estate for fees earned outside of the contingency agreement, [Haines] failed to preserve the Estate's portion of the settlement.

*People v. Haines,* No. 04PDJ112, slip op. at 9 (Colo.O.P.D.J. Apr. 21, 2006) (emphasis in original).

## II.

Substantial evidence in the record supports the Hearing Board's findings of fact and conclusions of law, including clear and convincing evidence that Haines: (1) knowingly misappropriated $70,000 belonging to her client estate deriving from a litigation settlement, which amount the personal representative and her co-counsel intended would be available to fund costs for additional litigation on behalf of the estate, and (2) lied in the Hearing Board proceedings that she had authorization to take this amount. We affirm the Hearing Board's order disbarring Haines and ordering her to pay restitution to the estate and the costs of the proceedings. However, we reduce the amount of restitution to $65,000 in recognition of the personal representative's testimony that he had authorized Haines's firm to pay itself a minor amount, approximately $5,000.

We disapprove of the Hearing Board's conclusion that Haines knowingly misappropriated money belonging to Mihm. Although Haines acted deceitfully towards Mihm, he had agreed with the personal representative to defer payment of his portion of the contingency fee in favor of the entire settlement proceeds being deposited into the estate account. Thus, the money she took belonged to the estate, not Mihm.

## A.

### Standard of Review

■ The Hearing Board is the finder of fact in disciplinary proceedings and has the authority to resolve conflicts in the evidence and make credibility determinations in rendering its judgment; we will disturb the Hearing Board's factual findings only if they are clearly erroneous and are not supported by substantial evidence in the record. C.R.C.P. 251.27(b); *In re Elinoff,* 22 P.3d 60, 63 (Colo.2001). A determination that an attorney has intentionally misappropriated funds belonging to a client must be supported by clear and convincing evidence. *People v. Varallo,* 913 P.2d 1, 11 (Colo.1996); *People v. Rader,* 822 P.2d 950, 953 (Colo. 1992).

Failure to comply with an obligation or prohibition imposed by a rule of professional conduct is a basis for invoking the disciplinary process. The rules presuppose that whether or not discipline should be imposed for a violation, and the severity of the sanction, depend on all the circumstances, such as the willfulness and seriousness of the violation, extenuating factors, and whether there have been previous violations. Preamble,

Scope and Terminology to Colorado Rules of Professional Conduct (2007).

Under Colo. RPC 8.4(c), it is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation. Under C.R.C.P. 251.27(b) we affirm the decision of the Hearing Board unless we determine, based on the record, that the findings of fact of the Hearing Board are clearly erroneous or that the form of discipline imposed by the Hearing Board (1) bears no relation to the conduct, (2) is manifestly excessive or insufficient in relation to the needs of the public, or (3) is otherwise unreasonable. We conduct a de novo review of the Hearing Board's conclusions of law. *Id.*

### B.

### The Record Contains Clear and Convincing Evidence Supporting the Hearing Board's Factual Findings of Knowing Misappropriation of Estate Funds

 On appeal, Haines challenges the Hearing Board's findings and conclusion that she knowingly misappropriated money belonging to the estate. A lawyer knowingly misappropriates when she takes a client's money entrusted to her, knowing that the client has not authorized the taking. *Varallo,* 913 P.2d at 11. As the attorney for the personal representative of the estate, Haines owed a high duty of trust towards the personal representative and the estate. *See People v. Nulan,* 820 P.2d 1117, 1119 (Colo. 1991). As personal representative, only Erpelding had the authority to authorize withdrawals of funds from the estate account.

We now turn to the evidence supporting the Hearing Board's finding that Haines lacked the personal representative's authorization to take $70,000 from the estate for her firm, and knowingly misappropriated those funds.

In early December 2002, the estate settled its claims against Chenault for $200,000. As personal representative for the estate, Er-

pelding (1) approved the settlement, and (2) agreed with Mihm's two-part proposal— Mihm would defer payment of his earned portion of the contingency fee in order to allow the estate to fund future litigation costs as they occurred, and the estate would pay Mihm for costs his firm had advanced in the Florida litigation.

At the December 19 meeting, while Mihm was discussing his proposal to defer his share of the contingent fee from settlement of the Florida litigation in order to have funds in the estate to pay costs of additional litigation in Florida and Rhode Island on behalf of the estate, Haines was privately contemplating paying her firm $70,000 from estate funds upon deposit of the settlement proceeds into the estate's account. Although she testified in the disciplinary hearing that she had advised Mihm of this intent at the December 19 meeting, the Hearing Board specifically found that she did not disclose it to Mihm.

In a memo of December 30, Ingrid Vinci of Mihm's firm provided a transcription of Haines's notes. This transcription shows that the December 19 meeting dealt with marshalling the assets of the estate and steps to be taken in regard to an appeal of the Florida litigation.

Haines claimed before the Hearing Board that the back side of her note paper contained the following notation: "84 70 25 Erpelding? Monies for estate!!" She argued that this notation documented her announcement at the December 19 meeting of her intent to pay her firm $70,000 when the settlement check was deposited. Haines asserted that Vinci had not seen and transcribed this part of her notes. Yet, there was sufficient room on the front side of the note paper to have added those figures, the implication being that Haines had added the figures to the back of the notes later.

The Vinci transcription circulated to Haines, who did not contemporaneously object to it, reads in full as follows:

MEMO

To: Mick Mihm, Betsy Hyatt, Susan Haines
From: Ingrid Vinci
Date: December 30, 2002

Subject: Susan's Notes From 12/19/02 Meeting

---

*Personal Representative*

Marshal Assets for the estate.

Estate owes a duty to creditors, heirs, distributees, legatees.

Mick [Mihm] is representing the Estate, not John [Erpelding].

| Florida | Colorado |
|---|---|
| 1. B.O. | 1. report of the P.R. |
| 2. fraud | 2. amend inventory accounting |
| 3. distrib. Of income | 3. to plead - holding assets of the estate |
| 4. breach of care | 4. set report for hearing |

In Colorado, proceed under reporting & fiduciary requirements.

In Florida, proceed to amend the complaint - pursue litigation, fight all defenses, they cannot use settlement agreement as defense.

Substantial evidence in the record supports the Board's finding that Haines knew about the agreement between Mihm and Erpelding to have Mihm defer his fee so the estate would have assets to fund costs in the Rhode Island and Florida litigation as they occurred, and remained silent about her intent to take the $70,000. She did not disclose to Erpelding, her client, that she intended to withdraw this amount from the estate account upon deposit of the settlement check. Immediately following the December 19 meeting with Haines, Mihm sent her a letter outlining the plan for distribution of the settlement funds, and identifying an amount of $89,648.29 his firm had advanced thus far as costs in the Florida litigation, for which he wanted payment from the estate. Haines did not respond to the letter.

Haines testified in the disciplinary hearing that she called Erpelding on December 22 or 23 and, during their conversation, he expressly authorized payment of $70,000 to her firm. The Hearing Board found that Haines lied under oath and did not have authority from Erpelding to withdraw $70,000. She testified as follows:

Counsel: Had Mr. Erpelding authorized you to pay yourself 70,000?

Haines: Yes, he had.[4]

There is clear and convincing evidence contradicting her testimony. Erpelding did not recall such a phone conversation and stated in a subsequent letter and deposition testimony that he did not authorize Haines to withdraw $70,000 from estate assets to pay her firm. At most he authorized a modest payment, no more than $5,000, believing that Colorado law, like California law, limited fees to a percentage of the estate based on its size. Haines did not inform him otherwise when she contemplated taking the $70,000 or advise him about the consequences of taking this amount on the agreement Erpelding had made with Mihm to keep the bulk of the settlement funds in the estate, so that they would be available to fund costs of additional litigation for the purpose of recovering additional funds for the estate.

On December 23, 2002, at the request of Haines, Campbell called Erpelding and asked if their firm could be paid its "fees." He did not mention a specific amount to Erpelding.

---

4. *See also* Transcript of Proceedings at 1329 (Jan. 24, 2006) (Haines testifying that on Dec. 22 or Dec. 23, 2002 she "called Mr. Erpelding … to seek approval for payment of Mr. Mihm's costs and the payment of our fees. *I told him that our fees were 70,000.*" (emphasis added)); *id.* at 1331 (Haines testifying that she specifically recollects a phone call on Dec. 22 or 23, 2002 during which she discussed specific dollar amounts with Mr. Erpelding); *id.* at 1358 (Haines testifying that she had no misunderstanding as to her "entitlement to take the $70,000 as [she] did and in the way [she] did").

The Hearing Board found, in particular, that neither Campbell nor Haines had mentioned an amount of $70,000 or that the fees Campbell was alluding to would include a significant amount of money for estate administration work. Erpelding told Campbell to "do whatever was necessary" to pay Mihm and Haines's firm, believing that he was authorizing the payment of costs Mihm had advanced in the Florida litigation and approximately $5,000 in fees to Haines.

Campbell's contemporaneous notes of this phone conversation show that Erpelding had received a copy of Mihm's December 19 letter regarding distribution of the settlement proceeds and approved of it. Campbell's notes of the phone conversation state in full, as follows:

— *got [Mihm]'s letter re settlement & payment of costs*

— *OK to do what is needed to get [Mihm] & us paid*

— He's in full agreement w/what has been done

— Very happy w/us, [Mihm] & Betsy

These contemporaneous notes refer to Mihm's December 19 letter confirming his recommendation for distribution of the settlement proceeds. At the bottom of this telephone memorandum is a note apparently appended by Haines stating: "John/YNB— please send confirmation letter to John Erpelding." Nothing in the December 19 letter or in this memorandum, including Haines's notations, mentions a $70,000 payment to Haines's firm.

Significantly, Campbell's notes confirm Erpelding's agreement to Mihm's proposal, which was to leave Mihm's $63,000 earned contingency fee in the estate account to fund litigation for additional recovery on behalf of the estate.

On December 30, 2002, Yvette N. Banker, an associate at Haines's firm, wrote Erpelding in full as follows:

This letter is to memorialize your conversation with Mr. Campbell on December 22, 2002.

You indicated that you were in full agreement with what has been done in the case and that you were happy with our firm, Mike Mihm and Betsy. Further, you stated that it is ok to do what is needed to get Mike Mihm and our firm paid. Mr. Mihm will be paid for his costs incurred and will be given a retainer for future costs. In addition, our firm will be paid for its legal fees incurred.

Please fell [sic] free to call me if you have any questions.

Sincerely,
HAINES & CAMPBELL, P.C.
Yvette N. Banker

Neither the Campbell memorandum, nor the Banker letter, contains any mention of Haines's intent to withdraw $70,000 in estate funds, and their testimony in the disciplinary proceedings does not contain any statement that Haines directed either Campbell or Banker to confirm with Erpelding Haines's purported phone call obtaining authorization for such an amount.

In the last week of December 2002, Mihm received and endorsed the settlement check in the amount of $200,000 to the estate. When Haines wrote the two checks to her firm totaling $70,000 against the account of the estate, her operating account had a balance of $7,250.09. Erpelding testified that he had not authorized the $70,000 withdrawal or the $25,000 check she sent to Mihm for the Rhode Island litigation or the $2,000 withdrawal to pay Michael Gross an ethics consultation fee. The Hearing Board found that Erpelding did not discover that Haines had withdrawn $70,000 in estate funds to pay her firm until sometime in May 2003. He, along with Mihm, asked Haines to return the money. She offered to negotiate the matter, but did not return the money. She informed Erpelding that her firm could not return the money without causing financial harm to the firm. She later filed bankruptcy without notifying Erpelding, prompting Erpelding to file a motion asking the bankruptcy court not to discharge her obligation to the estate in the amount of $70,000.

In a May 23, 2003 letter to Haines, Erpelding stated that he had "no recollection of a specific or general conversation or communication regarding the $7[0],000 distribution[.]" This communication was consistent with the

Campbell and Banker notes that did not contain reference to such an amount.

In the disciplinary proceedings, the Hearing Board found that Haines had initially claimed that she acted on a mistaken belief that she had permission to take $70,000 from the settlement funds. The Hearing Board found, instead, that she had a conscious objective to take $70,000, without disclosing this to Erpelding or Mihm, or obtaining their consent. Upon conducting a sanctions analysis, the Hearing Board determined that Haines's knowing misappropriation of funds warranted disbarment, restitution of the $70,000 to the estate, and payment of the costs of the proceeding.

Haines contends that, as of the end of December 2002 when she withdrew the funds from the estate, she had previously sent bills to Erpelding for estate administration fees totaling at least the $70,000 amount. Erpelding testified that he did not recall receiving the bills and did not find them in searching his records. In any event, Haines sent the bills to him in April of 2003 in connection with an estate inventory.

Haines contends that the Hearing Board came to its judgment of knowing misappropriation only after drawing several inferences adverse to her from the evidence. She relies on *People v. Schmeiser*, 35 P.3d 560, 564 (Colo.O.P.D.J.2001), for the proposition that, when presented with two reasonable inferences that may be drawn from the facts, the Hearing Board must draw the inference most favorable to the respondent attorney. Haines characterizes this case as a dispute between attorneys over a contingency fee and, at most, a result of her mistaken assumption that she had authorization from Erpelding to withdraw the $70,000 amount.

Haines's reliance on *Schmeiser* is misplaced and inapposite. First, an opinion by the Presiding Disciplinary Judge is not binding on this Court. *See In re Roose*, 69 P.3d 43, 48 (Colo.2003) (stating that only the Colorado Supreme Court "has the power to determine the law of this jurisdiction as applied in disciplinary proceedings").

Second, *Schmeiser* did not announce a broad rule that competing inferences must be drawn in favor of an accused attorney. In that case, the Hearing Board was faced with a limited evidentiary record in light of the respondent attorney's failure to respond to the charges against him. Reviewing this limited record, it determined that there was insufficient evidence to establish the necessary intent element for an allegation that the respondent attorney violated Colo. RPC 8.4(c) by making a knowing misrepresentation to a client. *Schmeiser*, 35 P.3d at 563–64. The Hearing Board noted that two inferences—one pointing toward culpability and the other pointing away from culpability—could reasonably be drawn from the limited evidence in the record. *Id.* at 564. Because there was no greater likelihood that the adverse inference was true, the Hearing Board concluded that the charge of knowing misrepresentation was not supported by clear and convincing evidence. *Id.*

Unlike *Schmeiser*, the Hearing Board in this case had the benefit of an extensive evidentiary record, including more than five days of testimony. Based on this record, it was able to assess the credibility and weight of all the evidence. *See Elinoff*, 22 P.3d at 63 ("As the factfinder, the Hearing Board has the duty to assess the credibility of the witnesses and testimony."); *People v. Distel*, 759 P.2d 654, 662 (Colo.1988) ("[W]hen a hearing board acts as fact finder, it has the duty to assess the credibility of all the evidence before it, both controverted and uncontroverted.").

The Hearing Board is established under our rules to find the facts. It makes credibility determinations and weighs the evidence; we do not do so. *In the Matter of James DeRose*, 55 P.3d 126, 130–31 (Colo.2002); *see also* Linda Donnelly, Rebecca Love Kourlis & Michael L. Bender, *How the New Attorney Regulation System Will Work*, Colo. Law., Feb. 1999, at 57, 58 (stating that factual findings of the hearing board will be upheld unless they are clearly erroneous). Based on our independent review of the record, we determine that there is substantial evidence to support the Hearing Board's findings of fact, including clear and convincing evidence that Haines knowingly misappropriated estate funds, justifying disbarment. Erpelding

testified that Haines did not inform him during the key last days of December 2002 that she intended to take $70,000. Instead, she fabricated testimony that she called Erpelding and had obtained his authorization.

Neither of Haines's colleagues, Campbell or Banker, obtained authorization from Erpelding for Haines to take an amount of $70,000 from estate funds. By failing to inform Erpelding of the amount of money she intended to withdraw, Haines did not adequately disclose material facts to Erpelding regarding the payment.

Haines knew that taking the $70,000 would deprive the estate of the benefit of the agreement Mihm made with Erpelding to defer his share of the contingent fee from the Florida litigation in order to fund the costs of future litigation for the purpose of recovering additional assets for the estate. She did not make adequate disclosure and advise Erpelding of the directly contradictory effect that taking $70,000 would have on the estate. Haines's lack of disclosure, advice, and authorization for such a large withdrawal of estate funds was contrary to the trust Erpelding had placed in her when allowing Haines to be the sole signatory on estate checks.

It was Erpelding's agreement with Mihm that enabled sufficient funds to be in the estate account to cover Haines's $70,000 withdrawal. Prior to the settlement, and the subsequent agreement between Mihm and Erpelding, the estate lacked sufficient assets to pay these fees. With only $7,250.09 in her operating account and the end of the year coming up with obligations to meet her payroll, Haines by deceit and fraud seized the opportunity to pay herself a large amount of money without her client's authorization, in violation of Colo. RPC 8.4(c).

Under the facts of this case, she not only failed to satisfy her ethical and fiduciary obligations to obtain from the estate's personal representative authorization for the $70,000 payment, she misappropriated estate funds. Resolving conflicts in the evidence, the Hearing Board acted within its authority in concluding that Haines acted deceitfully and with knowledge that she lacked authorization from Erpelding to take $70,000 in estate funds and place them in her operating account. Clear and convincing evidence supports the Hearing Board's finding that Haines engaged in a course of conduct that constituted knowing misappropriation of estate funds and lied under oath in the Hearing Board's proceeding.

However, we reduce the amount of restitution to $65,000 in recognition of Erpelding's testimony that he had authorized Haines to pay herself a minor amount in fees, approximately $5,000.

## C.

### The Hearing Board Mis-analyzed This Case as Also Involving a Misappropriation of Mihm's Funds

■ The Hearing Board also determined that Haines misappropriated funds belonging to Mihm. Our independent review of the record shows that Haines acted deceitfully towards Mihm. She remained silent in the face of Mihm's proposal to defer the contingent fee payment he had earned and failed to disclose her intent to take the $70,000. Had Mihm known Haines intended to pay herself more than her share of the contingent fee, Mihm likely would not have deferred the $63,000 payment due to him.

However, under the circumstances of this case, the Board was incorrect in determining that Haines misappropriated funds belonging to Mihm. At the time the settlement funds were deposited, there was no dispute between Mihm and Haines regarding distribution of the settlement funds. Thus, Haines was not required to segregate Mihm's share of the contingent fee from hers pending arbitration under the contingency fee agreement. Independent of Haines, Mihm had agreed with Erpelding to defer his $63,000 share of the contingent fee, deposit the settlement funds into the estate account, and have the costs he advanced in the Florida litigation paid out of estate funds. Mihm did not obtain an agreement from Haines that she would defer payment of the $4,000 she had earned under the contingency fee agreement for the Florida litigation.

Under the facts of this case, although Haines's taking of $70,000 from the estate account was a misappropriation of funds belonging to the estate, it was not a misappropriation of funds belonging to Mihm. Accordingly, we disapprove of the Hearing Board's conclusion that this case also involves misappropriation of Mihm's funds.[5]

## D.

## The Hearing Board's Sanction Is Appropriate

■■■ The primary purpose of the attorney regulatory system is to protect the public. *Crowe v. Tull*, 126 P.3d 196, 207–08 (Colo.2006); *In re Cardwell*, 50 P.3d 897, 904 (Colo.2002). In situations where a lawyer knowingly misappropriates client funds, the appropriate sanction is typically disbarment. *See, e.g., In re Cleland*, 2 P.3d 700, 703 (Colo.2000) ("As we have said numerous times before, disbarment is the presumed sanction when a lawyer knowingly misappropriates funds belonging to a client or a third person.") (citations omitted); *People v. Young*, 864 P.2d 563, 564 (Colo.1993) ("When a lawyer knowingly converts client funds, disbarment is 'virtually automatic,' at least in the absence of significant factors in mitigation."). In contrast, when a lawyer recklessly or negligently misappropriates funds, a period of suspension is typically adequate sanction. *See Varallo*, 913 P.2d at 11. In *Varallo*, we discussed the difference between a technical, or negligent, conversion of client funds, and a knowing conversion:

[D]epositing client funds into a trust account with a negative balance, if done only negligently, would be a technical rather than knowing conversion of client funds. On the other hand, using client funds for personal use without the client's permission by writing a check on a trust account that the lawyer knows contains only client funds would be a knowing conversion of client funds....

*Id.*

In this case, the Hearing Board determined that Haines took the $70,000 without notice to or permission from Erpelding and committed knowing misappropriation of client funds. As a result, the presumed sanction is disbarment.

In selecting the appropriate sanction, the Hearing Board should be guided by the ABA Standards for Imposing Lawyer Sanctions (1991 & Supp.1992) ("ABA Standards"). *See In re Fischer*, 89 P.3d 817, 819–20 (Colo. 2004). Use of the ABA Standards enhances consistency among the sanctions imposed in attorney discipline proceedings. *Id.* at 820. The ABA Standards require that in choosing the appropriate sanction, the Hearing Board consider the duty that was violated, the lawyer's mental state, the actual or potential injury caused by the misconduct, and the existence of various aggravating or mitigating factors. ABA Standards 3.0; *see Fischer*, 89 P.3d at 820. In this case, the Hearing Board found the following factors in aggravation: dishonest or selfish motive, submission of false evidence or statements, refusal to acknowledge wrongful nature of conduct, vulnerability of victim, substantial experience in the practice of law, and indifference to making restitution. Finding that the aggravating factors substantially outweighed the mitigating factors, the Hearing Board concluded that the appropriate sanction for the knowing misappropriation was disbarment. We agree.

---

5. Thus, we vacate the Hearing Board's finding that Haines violated Colo. RPC 1.15(a) and (c) by commingling Mihm's funds with her own during the dispute with him. We reject Haines's contention that the Hearing Board improperly ignored the testimony of her experts that, once the settlement funds were placed into the estate, Haines was entitled under probate law to pay herself hourly administrative fees. Haines did not have authorization from Erpelding to withdraw the $70,000 and did so without disclosure about the effects of paying herself such a large amount of administrative fees. Haines knowingly deprived the estate of the benefit of Erpelding and Mihm's agreement to have Mihm's $63,000 placed into the estate account. Under these facts, the Hearing Board properly determined that the probate code's provisions for payment of administrative fees as a priority vis-à-vis other types of payments is not applicable to justify payment to herself of the $70,000.

## E.

### The Hearing Board Properly Admitted Erpelding's Videotaped Deposition Testimony

■ Erpelding died in August 2005, during the course of these proceedings. Haines took Erpelding's preservation deposition on September 4, 2003. In addition to his videotaped deposition, Erpelding also executed two affidavits—one on July 7, 2003, the other on September 2, 2003—relating to the complaint against Haines. These affidavits were referenced during Erpelding's September 4, 2003 deposition.

Immediately prior to the start of the trial in this case, Haines asked the Hearing Board to admit the affidavits to be "considered in connection with Erpelding's [videotaped] deposition[.]" At that point, the Hearing Board informed the parties that in the interest of saving time, it had already watched the videotape of Erpelding's deposition. This was done outside of the presence of counsel for both parties.

Haines contends that the Hearing Board made a reversible error by viewing the videotaped deposition outside the presence of counsel. She argues that Colorado case law holds that a court abuses its discretion when it undertakes an independent, ex parte review of key evidence. She asserts that Erpelding's videotaped deposition was central to the Hearing Board's factual and legal conclusions and should not have been viewed outside the presence of counsel.

■ In order to preserve an objection on appeal, a party must have made a specific, timely objection at trial. C.R.E. 103(a)(1); *Hancock v. State*, 758 P.2d 1372, 1377 (Colo. 1988) ("Error may not be predicated on a ruling which admits or excludes evidence unless a substantial right of the party asserting error is affected and a timely, specific objection was made below."); *People v. Watson*, 668 P.2d 965, 967 (Colo.App.1983) ("[H]aving failed to object in the trial court on the grounds now asserted, [defendant] is deemed to have waived the objection and cannot raise it on appeal.").

In this case, Haines initially objected to the Hearing Board's viewing of the videotaped deposition outside of the presence of counsel. However, Haines then clarified her request by stating, "We're not asking to strike [the videotape] or anything like that." Instead, Haines simply sought assurance that the videotaped deposition "will not be given any more weight or any less weight than any other witness's testimony."

Haines waived her objection on this issue. Her clarification—that she was not seeking to strike the videotaped deposition, but rather was seeking assurance that it would be considered in the context of all the other evidence in the case—demonstrates that her intent was simply to have Erpelding's videotaped deposition fairly considered by the Hearing Board. The record indicates that Erpelding's videotaped deposition was considered in just such a manner.

## III.

Accordingly, we affirm the Hearing Board's order disbarring Haines and ordering her to pay restitution to the estate and the costs of the proceedings. However, we reduce the amount of restitution to $65,000 in recognition of Erpelding's testimony that he authorized Haines to pay herself a minor amount in fees, approximately $5,000. Furthermore, we disapprove of the Hearing Board's conclusion that Haines knowingly misappropriated money belonging to Mihm, her litigation co-counsel. Although Haines acted deceitfully towards Mihm, he had agreed with the personal representative to defer payment of his portion of the contingency fee in favor of the entire settlement proceeds being deposited into the estate account. Thus, the money she took belonged to the estate, not Mihm.

Justice COATS dissents, and Justice RICE joins in the dissent.

Justice COATS, dissenting.

While I consider the discipline meted out today to be out of all proportion to any misconduct proven below, I am even more concerned about what I perceive to be the exaggerated deference shown by the majority to the machinery we have ourselves creat-

ed to assist in supervising and regulating the profession. Despite acknowledging (as it must) the hearing board's fundamental legal error in characterizing the settlement funds deposited into the estate account, the majority continues to treat as near sacrosanct the board's factual and credibility assessments (which I believe to be incurably tainted by that error) and attempts to mold these findings into a theory of wrongdoing quite distinct from that found by the board, although equally unsupported by the record. Most of all, however, I am concerned that the process of attorney regulation not become a weapon in the struggle among attorneys for client control and apportionment of legal fees, something I believe we will all come to regret. I therefore respectfully dissent and briefly explain my concerns.

Although I consider the board's reasoning flawed in a number of key respects, I think its findings of misconduct stem largely from two fundamental errors: one primarily legal in nature and the other primarily evidentiary. The first was the board's failure to appreciate the legal significance of commingling settlement proceeds with the other assets of the estate. The second was the board's insistence that Erpelding, the personal representative, authorized only the payment of Mihm's costs and Haines's portion of the Chenault settlement, according to the contingency fee agreement entered into by Haines, Mihm, and the estate, despite Erpelding's own protestations to the contrary. But for these two misperceptions, the board's characterization of Haines's conduct as a knowing conversion, or knowing misappropriation, of property rightfully belonging to her co-counsel and the estate, becomes a distribution of estate funds, authorized (at least to all outward appearances) by the personal representative, within whose discretion it lay to make such a distribution.

With regard to the former, which is the crux of any allegation of misappropriation from Haines's litigation co-counsel, Mihm, even the majority now concedes that the board erred. Haines's withdrawals from the estate account in payment for her legal fees could not, as a matter of law, amount to a misappropriation of property from Mihm because Mihm retained no superior claim to those particular monies. By restrictively endorsing the settlement check to the estate account and consenting to its deposit, regardless of his expectations about the purposes to which the estate might ultimately apply the settlement funds, Mihm relinquished possession of it and permitted the settlement funds to become assets of the estate, subject to claims by creditors and distribution to heirs, under the sole authority of the personal representative. *See* § 15–12–805, C.R.S. (2007) (setting forth the order in which a personal representative is required to pay creditors' claims).

Whether the board actually believed the funds deposited into the estate account retained an independent character as settlement funds and remained subject to distribution according to the terms of the contingency fee agreement rather than the statutory priorities governing estate assets; or (as it suggests in its findings) it understood that they no longer retained such independent character but considered this distinction to be a "legal loophole," which it felt free to disregard in finding that Haines misappropriated property from Mihm, the error was of equal effect. Whatever misconduct Haines may otherwise have committed, she could not have misappropriated property from someone who neither possessed nor demonstrated any superior claim to it.

The board's mistake about the legal effect of the contingency fee agreement, however, impacted not only its conclusion about misappropriation from Mihm but also its finding of misappropriation in general. It was clear that apart from, and long before, the litigation contingency fee agreement, Haines entered into a fee agreement with the estate to be paid on an hourly basis for work done in administering the estate, and she claimed substantially more than the $70,000 she withdrew for work already done pursuant to that agreement. The board was not concerned about, and never disputed, the fact that the estate owed her those hourly fees,[1] finding

---

1. Interestingly, both the board and the majority suggest that Mihm was also owed approximately

instead that the settlement funds deposited into the estate account remained subject to distribution according to the contingency fee agreement; that Erpelding understood as much and intended to authorize payment only according to that agreement; and that Haines must have been aware of his intent to authorize her withdrawal of only $4,000 in fees because that would have been the full extent of her share of the settlement proceeds.

The board's mistaken belief that the contingency fee agreement controlled distribution therefore not only led it to erroneously treat estate monies as belonging to Mihm but also colored its findings concerning Erpelding's authorization and Haines's entitlement to payment. Its finding that Haines paid herself an amount she knew was unauthorized, which was essential to its finding of a knowing misappropriation from the estate as well as from Mihm, was an inference directly from its mistaken belief that Erpelding lacked the legal authority to pay other estate debts from the account. In addition, however, the board's factual finding that Erpelding intended to authorize a withdrawal of Haines's $4,000 share of the contingency fee from the Chenault settlement simply ignored Erpelding's own testimony and was absolutely without support in the evidentiary record.

Apart from the questionable propriety of making a distribution of the Chenault settlement at that time,[2] Erpelding steadfastly denied doing any such thing. Both his affidavit and deposition testimony made clear that despite Campbell's failure to specify an amount, when he told Campbell to do whatever was necessary to pay both firms as requested, he understood perfectly well that Campbell was requesting payment for work done by the firm in administering the estate. Erpelding testified that he misunderstood only the amount of estate fees due to Haines.

Erpelding, however, attributed his misunderstanding to his own assumption that estate fees were limited in Colorado to a statutorily-prescribed percentage of estate assets, as would have been the case in California, where he practiced probate law for some fifty years. See Cal. Prob.Code § 10810 (providing that an attorney for the personal representative shall receive compensation based on the value of the estate accounted for as follows: four percent on the first $100,000 and three percent on the next $100,000, which in the case at hand would result in $7,000 in compensation based on the $200,000 amount). Erpelding's own testimony therefore indisputably established his understanding of Campbell's request as one for payment of the firm's legal probate fees, as well as his intent to authorize payment of those fees. He was merely operating under the misapprehension that any such payment would have to be made at a statutorily-prescribed rate, rather than according to either the contingency or hourly fee agreements.[3]

The board's factual findings about the inadequacy of Campbell's request and Erpelding's actual intent, not to mention its assessment that Haines must have known of

---

$500,000 in hourly fees, logged in connection with the Florida litigation. Unlike Haines, however, Mihm was hired only on a contingency fee basis, and therefore his entitlement to attorney fees was entirely dependent upon the proceeds of any litigation, regardless of the time he may have expended in acquiring it.

2. The express terms of the contingency fee agreement referred to payment only upon conclusion of the case. Had the settlement of the Chenault litigation remained separate from the other estate funds, there seems to be little question that the agreed-upon contingent attorney fee for litigation could have been taken before the estate's share went to pay its other debts. Both Mihm and Campbell testified, however, that it would have been premature to distribute the proceeds recovered through litigation until all of the litigation was complete.

3. "I believed I authorized them to pay themselves pursuant to statutory authority which would have provided only a small percentage of the overall assets available in the estate being paid for attorney's fees." Deposition of John Erpelding 87 (Sept. 4, 2003). In responding to an inquiry from regulation counsel regarding discussions with Haines and Campbell about payment of their fees, Erpelding said, "I have no recollection, specific or general regarding an amount of administrative costs, fees, or litigation fees. It never came up. I never even—I don't even remember hearing the subject of litigation come up. But—but I said, 'You know, do what you—you have to do.' And said, 'I'm basing it on my experience,' which I assumed was pretty much the same in Colorado as it is here (California)." Id. at 38.

Erpelding's intent to authorize no more than her share of the contingency fee, were therefore flatly contradicted by the record. While Campbell's failure to specify the precise amount of his request, relying instead on Erpelding's understanding from prior billing, may have amounted to a lapse on his part, the board's conclusion that Erpelding understood the request as one for the Haines firm's share of the contingency fee was clearly erroneous; and to infer that Haines must have known that Erpelding was conflating Colorado and California probate law or to suggest that she should have warned him not to make that mistake, is nothing short of preposterous. In light of his own mistake about the controlling law, even Erpelding allowed that Haines's withdrawal based on the amount of her hourly billing may have been the result of a misunderstanding.[4]

In fact, all four of the hearing board's findings of misconduct were inextricably intertwined with these two fundamental errors. The board found that Haines violated Colo. RPC 1.4(b) by failing to explain to Erpelding that the monies from which her requested payment would have to come were subject to the contingency fee agreement, which was in fact not the case. It found that she violated Rules 1.15(a) and (c) by failing to keep separate property belonging to Mihm, which even the majority acknowledges to be error. And it found that Haines violated Rules 1.15(a) and (f) by taking money earned outside the contingency fee agreement, thereby failing to

preserve the estate's portion of the settlement proceeds allotted it by the contingency fee agreement.

Finally, the board's most serious finding—that Haines violated Rule 8.4(c) by misappropriating funds belonging to both the estate and Mihm—was justified on the grounds that the settlement proceeds should have been shared as set forth in the written fee agreement, allowing Haines no more than five percent of the $66,000 attorney fee award. With its own words, the board could not have made more clear that its findings with regard to ownership, entitlement, priority of payment, and authorization were all governed by its fundamental misunderstanding about the legal character of the commingled settlement funds.

Notwithstanding the majority's acknowledgement that the Chenault settlement had become estate property, it continues to minimize both the impact of the board's misunderstanding and the board's inexplicable disregard of Erpelding's own testimony.[5] The majority continues to slavishly defer to the board's ultimate factual conclusions, even though they were clearly inferred from erroneous premises. And in what can only be described as an unusually lengthy and disputatious recounting of the evidence, it searches the record for new and different support for the board's discredited findings.

The core of the majority's case for a knowing misappropriation remains the board's "factual" conclusion that Haines's conscious

**4.** As the board itself noted, Erpelding testified numerous times that Haines had done fine work for the estate, that he believed she made a mistake in taking the funds in question, and that he did not desire that she be harmed by discipline proceedings.

**5.** Although its significance for purposes of the board's particular findings of misconduct remains unclear to me, the majority also continues to assert that Haines acted deceitfully toward Mihm because she was aware that Mihm and Erpelding had agreed that the estate would pay Mihm's costs and reserve the rest of the settlement for future litigation. Quite apart from Haines's own denials, the evidence simply did not support any such awareness on her part. Erpelding was, of course, not at the December 19 meeting with Mihm, Haines, and Campbell, and was not yet on board with Mihm's proposal. All of the testimony, as well as Mihm's post-

meeting letter, made clear that, at that point in time, Mihm's proposal was nothing more than a proposal, to which Haines never agreed; and Erpelding testified that his acceptance came sometime later, around December 23. In fact, the board finds only that Mihm and Erpelding decided to use Mihm's fees to fund a war chest, "subject to Respondent's approval." The majority's own inference from Campbell's handwritten notes of his December 23 phone conversation with Erpelding that Erpelding communicated to Campbell his assent to Mihm's proposal imputes a meaning to Campbell's notes that simply does not exist. At least in the absence of any awareness of an agreement between Mihm and Erpelding to use the funds otherwise, Haines needed only Erpelding's authorization to be paid what she was owed by the estate, and not the consent of Mihm.

objective was to take $70,000 without disclosure to or consent from either Erpelding or Mihm. Because the board, however, expressly reached this conclusion by mistakenly reasoning that Haines knew both she and her client were still bound by the terms of the fee agreement and that she was therefore entitled to, and Erpelding could authorize payment to her of, no more than a $4,000 contingent fee,[6] that factual finding can be entitled to deference only if it finds support elsewhere in the record.[7] I believe the majority goes awry by straining to marshal that support from bits and pieces of the record neither pursued nor relied on by the board itself.[8]

The terms in which the board's findings of misconduct are couched and its own articulation of support for those findings should be sufficient to make this court doubt their reliability. In this case, however, I believe we should be particularly concerned by the outcome's heavy dependence on credibility determinations involving the recollections, understandings, shadings, and motivations of co-counsel with disparate financial interests, and by what I consider to be too great a willingness to defer to findings of the board, despite its having been influenced by a clear legal misconception. Instead, I believe this court has a greater responsibility (and with the "clear and convincing" standard of proof we intended to give ourselves greater latitude) in regulating the profession.

In large part because the ethical standards governing the profession are necessarily vague (at times even approaching the aspirational), I believe excessive deference by this court to any subordinate body we create implicates fundamental, due process concerns. Disbarment or suspension from the practice of law amounts to far more than exclusion from a voluntary group or association. It deprives a lawyer of the means to earn a living, and perhaps even of participating in public life, in a way that unquestionably affects substantial property rights and

---

6. Largely for the same reasons, the board rejected Haines's own testimony that she felt sure she had disclosed the specific amount she was requesting to Erpelding, as well as the testimony of both Haines and Campbell, who were present at the December 19 meeting, that Haines expressly disclosed to Mihm the amount of the firm's hourly attorney fee claim at that time. (Although an associate of Mihm was also present, she could remember nothing about the meeting and therefore did not support Mihm's recollection.) In light of Campbell's emphatic support for Haines's recollection of the December 19 meeting and his explanation for not again specifying the amount of their requested fee in his conversation with Erpelding, the board's finding of a conscious objective to take without disclosure strongly implies a criminal conspiracy between Haines and Campbell.

7. For example, the majority cites as evidence of Haines's intent to take more than her share of the contingent attorney fee the annotation she appended to one of the two checks she cashed. As her testimony explained, long before Mihm's entry into the case or the drafting of a contingency fee agreement, her firm had subdivided its Edouart estate records into a number of separate files, one of which was reserved for probate fees and costs incurred in connection with the Chenault litigation, which her firm was billing on an hourly basis but had little expectation of ever recovering. Interestingly, the hearing board was so fixated on its theory that Haines and Erpelding considered Campbell's request and Erpelding's authorization to be for payment pursuant to

the contingency fee agreement that it actually misquoted the notation as indicating "contingency fees" rather than "Probate fees and Costs in Chenault litigation," as was actually the case.

8. In this regard, the majority suggests that Haines took other money from the estate without permission, with regard to which no complaint was filed and no findings made. It suggests, for instance, that the $25,000 check she mailed to Mihm, along with his $84,000 costs reimbursement, to be used as a retainer for new local counsel, was unapproved by Erpelding; and that Haines spent $2,000 of estate money for an ethics consultation with Mr. Gross. As she explained when the matter was raised in passing, she retained Mr. Gross with regard to the upcoming litigation, and the bulk of his retainer was returned when it was not earned. The majority also cites the testimony of Mihm's associate that she did not see the figures Haines claimed to have scrawled on the back of her notes of the December 19 meeting, when those notes were originally transcribed, as evidence that they were only later added by Haines. In addition to the fact that Mihm's associate testified that she remembered virtually nothing about the meeting or transcribing the notes, and was presuming that she must not have seen the figures or she would have transcribed them, the inference suggested by the majority appears to conflict with that drawn by the board, which believed instead that Haines annotated the figures at the meeting but deliberately concealed her planned distribution from Mihm.

expectations. *See Burton v. Mottolese,* 267 Conn. 1, 835 A.2d 998, 1014 (2003) (citing *Kucej v. Statewide Grievance Comm.,* 239 Conn. 449, 686 A.2d 110 (1996), *cert. denied,* 520 U.S. 1276, 117 S.Ct. 2457, 138 L.Ed.2d 214 (1997)) (recognizing a license to practice law as a vested property interest entitled to protections of due process of law). Although ostensibly not intended as punishment, *see In re Cardwell,* 50 P.3d 897, 904 (Colo.2002), this official deprivation of property necessarily entitles attorneys to reasonable notice of the standards to which they must conform their conduct and reasonable consistency in the application of those standards. *Cf. Vill. at Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (holding legislative proscriptions void for vagueness if too indefinite to give a person of ordinary intelligence a reasonable opportunity to know what is prohibited or insufficiently explicit to avoid arbitrary and discretionary enforcement).

I believe that both the "clear and convincing" standard of proof and the right to individualized review by this court designedly serve to offset the substantial degree of ambiguity purposely left in our descriptions of professional misconduct, as well as the almost unbridled discretion left to the board in prescribing sanctions.[9] The former standard serves not only to require convincing proof of objectionable conduct, mental states, and injury, but also to ensure that attorney conduct is sanctionable only to the extent that it clearly lies beyond the bounds, rather than merely at the less-clearly defined fringes, of acceptable behavior. The latter serves to ensure that even minimally guided discretion, especially in the fashioning of sanctions for the protection of the public, will not be applied too disparately, according to the individual sensibilities of continuously varying board members. Were we to consider our review of professional discipline as limited, for instance, as our review of criminal prosecutions and sentencing, I believe the dictates

of due process would require us to much more clearly define the behavior and circumstances meriting the official deprivation of property and reputation resulting from disbarment.

From the record before us I am unable to say what, if any, sanctionable conduct was committed by Haines, much less what the sanction for it should be. Because it seems clear to me, however, that the record does not support a finding, by clear and convincing evidence, that she knowingly converted the property of either her client or her co-counsel, I would reverse the board's order of disbarment and remand for any further proceedings that might be justified under a correct interpretation of controlling law.

I therefore respectfully dissent.

I am authorized to state that JUSTICE RICE joins in this dissent.

---

9. *Cf. Statewide Grievance Comm. v. Botwick,* 226 Conn. 299, 627 A.2d 901, 906 (1993) ("In attorney disciplinary proceedings, two interests are of paramount importance. On the one hand, we must not tie the hands of grievance committees and trial courts with procedural requirements so strict that it becomes virtually impossible to dis-

cipline an attorney for any but the most obvious, egregious and public misconduct. On the other hand, we must ensure that attorneys subject to disciplinary action are afforded the full measure of procedural due process required under the constitution so that we do not unjustly deprive them of their reputation and livelihood.").