The **PEOPLE** of the State of Colorado, Complainant,

v.

Tamika Monique **PALMER.**

No. 14PDJ049.

Office of the Presiding Disciplinary Judge of the Supreme Court of Colorado.

March 26, 2015.

**21.** The People filed a statement of costs at the hearing in the amount of $91.00 for an adminis- trative fee.

which she had been hired, and abandoned her clients. She also neglected to participate in this disciplinary proceeding. The Court finds disbarment to be the appropriate sanction.

## II. *PROCEDURAL HISTORY*

■ The People filed a complaint on June 23, 2014. Respondent failed to answer, and the Court granted the People's motion for default on September 5, 2014. Upon the entry of default, the Court deems all facts set forth in the complaint admitted and all rule violations established by clear and convincing evidence.[1]

At the sanctions hearing, the Court considered the testimony of Shaun Baker, Maria Padilla, and Isabelle Garcia. The Court admitted exhibits 1–2.

## III. *ESTABLISHED FACTS AND RULE VIOLATIONS*

The Court hereby adopts and incorporates by reference the factual background of this case, as fully detailed in the admitted complaint. Respondent took the oath of admission and was admitted to the bar of the Colorado Supreme Court on May 17, 2010, under attorney registration number 42046. She is thus subject to the Court's jurisdiction in these disciplinary proceedings.[2]

### Baker Matter

Martha Baker is an Ecuadorian national who first entered the United States on April 1, 1998. After she arrived, removal proceedings were initiated against her. While Ms. Baker was granted voluntary departure, she did not depart the United States within the allotted time. On June 2, 2000, she was deported but re-entered the United States via Mexico on June 23, 2010, without inspection.

Thereafter, Ms. Baker married Shawn Baker, a U.S. citizen. In 2003, Ms. Baker was criminally assaulted in California, her

**OPINION AND DECISION IMPOSING SANCTIONS PURSUANT TO C.R.C.P. 251.19(c)**

### I. *SUMMARY*

In three client matters, Respondent converted funds, failed to perform services for

---

1. *See* C.R.C.P. 251.15(b); *People v. Richards*, 748 P.2d 341, 346 (Colo.1987).

2. *See* C.R.C.P. 251.1(b). Respondent's registered business address is 1665 Grant Street, 3rd Floor, Denver, Colorado 80203.

assailant was prosecuted. The Bakers then moved to Springfield, Colorado.

On September 17, 2012, the Bakers retained Respondent to assist Ms. Baker in obtaining a U Visa from United States Citizenship and Immigration Services ("USCIS"). These types of visas are granted to victims of crimes who are illegally present in the United States. Ms. Baker and Respondent entered into a billing agreement for a flat fee of $2,500.00. Also on September 17, Ms. Baker received a client engagement letter from Respondent. Neither the billing agreement nor the client letter described the work Respondent agreed to perform or provided an explanation of how Respondent would earn portions of the flat fee. Mr. Baker gave Respondent a check for the entire flat fee on September 17, which Respondent deposited directly into her operating account. By October 16, 2012, Respondent had consumed the entire $2,500.00 on personal and business expenses.

To assist in obtaining the U Visa, Mr. Baker provided Respondent with the name and address of the Los Angeles County University Southern Medical Center ("LAMC"), the medical facility where Ms. Baker was treated after the assault in 2003. He also gave Respondent the address for the Los Angeles district attorney who prosecuted Ms. Baker's assailant. The Bakers then mailed additional documentation for the U Visa to Respondent, inadvertently sending Mr. Baker's fingerprint card. They asked Respondent to return the card, but she did not.

On October 18, 2012, instead of corresponding with LAMC, Respondent sent a letter to the University of California San Francisco Medical Center ("SFMC"), stating that Ms. Baker was a former patient at LAMC and enclosing a medical release form signed by Ms. Baker. Ms. Baker, however, was never treated at SFMC. In November 2012, Respondent informed the Bakers that she was waiting for an I–918 Supplement B Form and for Ms. Baker's medical records. An I–918 Supplement B Form must be completed by an agency certifying a victim's U Visa nonimmigrant status, which is typically completed by a district attorney's office.

On December 3, 2012, the Bakers traveled to Respondent's office in Denver from their home in Springfield for a meeting. During the meeting, Respondent informed the Bakers that she had received Ms. Baker's medical records from St. Francis Medical Center but was still waiting for the LAMC records. However, this statement was a misrepresentation: Respondent could not have received any of Ms. Baker's records from St. Francis Medical Center because it had destroyed them.

During that same meeting, Respondent told the Bakers that she was going to Jamaica. Thereafter, the Bakers had difficulty reaching Respondent by telephone. Respondent frequently was not in her office in January 2013. On January 7, 2013, Respondent's assistant told Mr. Baker that Respondent was busy with cases and would not be taking any telephone calls until after January 17, 2013.

On January 17, 2013, Respondent sent a second letter to SFMC, again stating that Ms. Baker had been a patient at LAMC, and enclosing another signed release for medical records. SFMC responded by letter, indicating that they did not have any medical records for Ms. Baker. On January 30, Mr. Baker called the Los Angeles district attorney, St. Francis Medical Center, and LAMC. All of these entities stated that they had had no communication with Respondent, nor had she requested Ms. Baker's medical records.

On January 31, 2013, Mr. Baker emailed Respondent and terminated her representation due to her failure to communicate with him and his wife and her failure to contact the relevant agencies for Ms. Baker's medical documentation. Respondent responded to Mr. Baker's email and said that she understood. She also stated that when the Bakers hired new counsel she would send the new attorney Ms. Baker's medical records and the I–918 Supplement B Form. She also told him that she would send them an accounting.

Mr. Baker again emailed Respondent on February 12, 2013, asking her to provide him with Ms. Baker's file and an accounting. Respondent replied by email two days later, attaching Ms. Baker's file and a termination

letter, which indicated that the Bakers were entitled to receive a $327.32 credit.

Ms. Baker received a copy of her file in the mail on March 2, 2013, along with a billing statement and a check for $327.32 drawn on Respondent's COLTAF account. Respondent's billing statement was calculated on an hourly rate of $150.00. Respondent did not, however, agree to represent Ms. Baker for an hourly fee. Respondent's billing statement indicated that she prepared the following USCIS forms for Ms. Baker: a G–28 Notice of Entry of Appearance, an I–918 Petition for U Nonimmigrant Status, an I–765 Application for Employment Authorization, an I–912 Request for Fee Waiver, an I–192 Application for Advance Permission to Enter as a Nonimmigrant, an I–212 Application for Permission to Reapply for Admission Into the United States After Deportation or Removal, and an I–601 Application for Waiver of Grounds of Inadmissibility.

Respondent's invoice also showed that she prepared a medical records · request to SFMC—the wrong hospital—twice. She charged the Bakers $112.50 for preparing these requests. She also charged the Bakers $174.00 for "Research—INA 212 Waiver for Re-entry after expedited removal." This application was unnecessary, however, given Ms. Baker's circumstances. Respondent also charged the Bakers $336.00 for reviewing twenty-eight voicemail messages they had left for her. Respondent's billing agreement contained no benchmarks, and the Bakers terminated her for cause under the agreement. Therefore, Respondent did not earn any portion of her flat fee until the work she was hired for—the completion of Ms. Baker's U Visa—was complete.

. Once the Bakers had reviewed Ms. Baker's file, they discovered that the I–918 Petition for Nonimmigration Status was deficient because it contained the wrong address, listed the wrong location of one of Ms. Baker's children, failed to list her other three children, and was not signed by Respondent. Additionally, Respondent had prepared an I–601 Application for Waiver on Grounds of Inadmissibility for Ms. Baker using an expired USCIS form. Also, they had discovered that Respondent had filled out the I–912

Request for Fee Waiver with misspelled names.

Respondent never returned any of the Bakers' original documents, including their passport photos, family photos, copies of the Bakers' marriage certificate, children's birth certificates, and social security cards. During the course of the representation, the Bakers tried to call Respondent numerous times and left multiple messages for her. She only returned a few of these calls.

 Through this conduct, Respondent violated nine Rules of Professional Conduct:

- She violated Colo. RPC 1.1 (a lawyer shall provide competent representation to a client) when she failed to properly analyze Ms. Baker's immigration situation and to make the correct legal conclusions regarding which immigration forms were necessary for Ms. Baker's case.
- Respondent also violated Colo. RPC 1.3(c) (a lawyer shall act with reasonable diligence and promptness when representing a client) by failing to correctly file any of the immigration forms on Ms. Baker's behalf during the five-month span of the representation. Respondent further contravened this rule when she neglected to timely request medical records for Ms. Baker, even though the Bakers gave her the correct contact information for the medical providers.
- When she failed to respond to the Bakers' repeated telephone messages inquiring into the status of Ms. Baker's case, Respondent acted in violation of Colo. RPC 1.4(a)(4) (a lawyer shall promptly comply with reasonable requests for information).
- By charging an unreasonable fee of $2,172.68 for her services when she performed little work, Respondent acted in contravention of Colo. RPC 1.5(a) (a lawyer shall not charge an unreasonable fee or an unreasonable amount for expenses).
- Respondent disobeyed Colo. RPC 1.5(b) (a lawyer shall communicate, in writing, the rate or basis of the fee and expenses within a reasonable time after commencing representation) when she failed to

include in her billing agreement a statement of the work she was to perform and an explanation of how portions of her flat fee would be earned.

- When she took possession of and consumed the fees that the Bakers had paid her without conferring any benefit upon them, she violated Colo. RPC 1.5(f) (fees are not earned until a lawyer confers a benefit on the client or performs a legal service).
- Respondent disregarded Colo. RPC 1.15(a) (a lawyer shall hold client property separate from the lawyer's own property) when she immediately deposited the Bakers' funds into her operating account before she had earned them.
- By failing to return all the documents and attorney's fees that the Bakers had given her once they terminated her representation, she violated Colo. RPC 1.16(d) (a lawyer shall protect their clients' interests upon termination of the representation).
- Finally, Respondent's misconduct violated Colo. RPC 8.4(c) (a lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation) because she knowingly converted the Bakers' funds by immediately placing them in her operating account prior to earning them and when she consumed them for personal and business expenses.

### Padilla Matter

Maria Padilla and her son, Mario Miguel Aranda Padilla, entered the United States from Mexico on Visitor B Visas in 1998. Mario was three years old. They both remained in the United States beyond the time limit on their visitor visas. They did not request an extension from USCIS and therefore remained in the United States illegally.

In 2007, Padilla married David Buena in Arvada, Colorado. Buena is a U.S. citizen. Padilla retained Respondent to assist her in obtaining permanent resident status for her and Mario. She entered a billing agreement with Respondent on February 20, 2012, which required her to pay Respondent a flat fee of $1,500.00 in monthly increments of $100.00. Respondent did not explain to Padilla what work she would perform or how she would earn portions of the flat fee.

Respondent was supposed to file two I–130 Petitions for Alien Relative, two I–485 Applications for Adjustment of Status, and two I–601 Applications for Waiver of Grounds of Inadmissibility for Padilla and Mario. An I–130 Petition is the first document a U.S. Citizen needs to file to help a relative become a lawful permanent U.S. resident. Because Padilla's visa had expired before she filed the I–485 Petition, she was not eligible to adjust her status. Additionally, the I–601 Forms were not necessary for Padilla or Mario, given their circumstances.

During their first meeting, Padilla gave Respondent substantial personal and familial documentation, including copies of her marriage certificate, her children's birth certificates, and Mario's school records. Padilla could not locate, however, the admission numbers given to her and Mario at the port of entry when they entered the United States. Respondent did not file a request to obtain the admission numbers until March 2013, a year after she was retained.

Padilla paid Respondent $100.00 per month in cash beginning in February 2012, for a total of $1,500.00. Respondent's bank records demonstrate that she immediately deposited each cash payment into her operating account and used those monies to pay for personal and business expenses.

On June 14, 2012, Respondent's employee, Gloria Rodriguez, sent Padilla an email with the subject line, "Money Order Amounts." The email stated:

The following amounts are for the Money Orders along with the agency to which they must be made out. Each amount is for both you and Mario, and must be made SEPERATELY (sic).

- I–130 $420–Mario, $420–Maria
- I–485 $1070–Mario, $1070–Maria
- I–601 $585–Mario, $585–Maria

PAY TO: Department of Homeland Security.

On June 27, 2012, Padilla met with Respondent and gave her four money orders totaling $2,140.00 for the two I–485 applica-

tions; one money order for $1,070.00 for the two I–601 applications; and one money order for $420.00 for Maria's I–130 application. These money orders were payable to "The Law Office of TM Palmer." Respondent told Padilla that she would file applications for both Padilla and Mario in July 2012.

On July 3, 2012, Respondent deposited the four money orders, totaling $2,140.00, directly into her operating account. Padilla believed these money orders would be used to pay the filing fees for her and Mario's I–485 applications. She did not authorize Respondent to use these funds for any other purpose. Nevertheless, by July 12, Respondent had used all of these funds for her personal and business expenses, never filing the I–485 Applications with USCIS.

Padilla did not hear from Respondent after their meeting on June 27, 2012. Padilla left Respondent numerous voicemail messages, but Respondent never returned her calls. Sometime in July 2012, Padilla went to Respondent's office, where Respondent told her that she would file her and Mario's applications in August 2012.

In October 2012, Respondent informed Padilla that because she had sent the immigration documents to USCIS in California instead of its office in Texas, she would have to await their return from Texas. But according to USCIS, all applicants who reside in Colorado must send their forms to Arizona, not California or Texas. Respondent then told Padilla that she should receive a confirmation receipt from USCIS by the end of December 2012. Padilla did not receive anything from USCIS in December.

In early 2013, Padilla went to Respondent's office, where Respondent admitted that no applications had been filed for Padilla. On February 22, 2013, Respondent mailed a packet of documents to "USCIS Phoenix Lockbox Facility Attn: I–130." Among these documents was Padilla's I–130 Application. Padilla was informed by USCIS on February 25, 2013, that it had received her application and that it was processing the application. Padilla never received a similar notice from USCIS regarding Mario's application, however. Despite this, Respondent assured Padilla that she had filed Mario's application. In fact, Respondent had not filed an I–130 Petition for Mario.

On March 12, 2013, Respondent again told Padilla not to be concerned about the lack of correspondence regarding her son's petition. Around May or June 2013, Padilla received a CD from USCIS, which contained the admission number information requested by Respondent. Padilla did not understand what this information meant, so she called Respondent's office and went there in person. No one was present at Respondent's office to meet with her, nor were her telephone calls answered.

Respondent sent Padilla a letter on June 24, 2013, stating that she was closing her office and transferring Padilla's client file to another immigration attorney. The letter stated that Padilla would be "receiving a statement of work performed and important case dates by mail on, or after July 12, 2013. If you would like your file delivered to you on a compact disk (CD), please notify me by phone...." Around June 27, 2013, Padilla received this letter from Respondent. Padilla called Respondent, who told her she was trying to find another lawyer to take over her and her son's cases.

On July 10, 2013, Padilla met Respondent at her office, and Padilla gave Respondent the CD she had received from USCIS. At that meeting, Respondent told Padilla that she had accepted a new job and asked her whether she was willing to pay another attorney to finish her case. Padilla told Respondent that she did not have the funds to hire another lawyer. Respondent told her that she would call her on July 20, 2013, to discuss paying another lawyer, but she never called. Respondent also did not return Padilla's CD or return any of the original documents Padilla had given her at the beginning of the representation.

During the investigation of this matter, Respondent gave Padilla a check for $369.27 but did not provide an accounting to explain the amount of the refund. Between February 2012 and May 2013, Respondent converted $3,640.00 of Padilla's funds.

Through the above described conduct, Respondent violated nine Rules of Professional Conduct:

- Respondent violated Colo. RPC 1.1 when she failed to analyze Padilla's and Mario's immigration matters, to make the proper legal conclusions on their behalf, and to determine the proper immigration forms to file in their cases. She also violated this rule when she initially mailed Padilla's I-130 petition to the Texas USCIS office.
- By agreeing to represent Mario in February 2012 but never filing any documents on his behalf, Respondent violated Colo. RPC 1.3.
- Respondent violated Colo. RPC 1.4(a)(4) when she failed to respond to Padilla's numerous telephone messages inquiring about the status of her and her son's matters.
- Respondent violated Colo. RPC 1.5(a) when she collected filing fees of $2,140.00 for the I-485 Applications for Adjustment of Status that neither Padilla nor Mario were eligible to receive. She also contravened this rule by charging an unreasonable fee of $1,130.73 for legal services that lacked value to Padilla and Mario.
- Respondent violated Colo. RPC 1.5(b) by failing to include a statement of the work to be performed and an explanation of how her flat fee would be earned in her billing agreement.
- When she took possession of and consumed all of the fees Padilla had paid her even though she had not conferred any benefit upon Padilla or Mario, Respondent acted in contravention of Colo. RPC 1.5(f).
- Respondent violated Colo. RPC 1.15(a) by depositing Padilla's funds into her operating account before she had earned them.
- Respondent violated Colo. RPC 1.16(d) when she effectively terminated her representation of Padilla and Mario, when she failed to return Padilla's original documents, when she failed to return Padilla's funds, and when she failed to return the $2,140.00 in filing fees Padilla paid for the two I-485 applications Respondent neglected to file.
- When Respondent retained unearned fees, even though she had not completed the work for which she was hired, she contravened Colo. RPC 8.4(c). Respondent also knowingly committed a violation of this rule when she converted Padilla's fees by placing the funds directly into her operating account before earning them and when she consumed the funds by paying for personal and business expenses.

## Marin Matter

Jose Angel Garcia Marin arrived in the United States from Mexico in September 1998, when he was 13 years old. Isabel Garcia is a family friend and Marin's high-school classmate.

On October 30, 2012, Marin was charged with two class-5 felonies and three class-2 misdemeanors in Jefferson County District Court Case Number 2012CR2866. The charges arose from an incident with his wife on October 15, 2012. In the case, Marin was represented by Kaushiki Chowdhury, a public defender. On December 26, 2012, Marin was arrested for Driving While Ability Impaired ("DWAI") and detained at the Denver Justice Center. While he was detained, he came into contact with Immigration and Customs Enforcement ("ICE") officers during a routine jail check.

Marin pleaded guilty to DWAI on April 5, 2013, in Denver County Court Case Number 12M3163. He was sentenced to ninety days in jail and was required to pay fines and costs. On April 12, Marin was released into ICE's custody. He was then taken to the ICE detention facility in Aurora and removal proceedings were initiated against him.

In May 2013, Garcia and Marin's mother met with Respondent to discuss Marin's cases, and Garcia hired Respondent for a flat fee of $2,500.00. For this fee, Respondent agreed to handle all of Marin's immigration matters, including appearing at the removal proceedings, adjusting his status, obtaining a work permit, and consulting with Chowdhury

regarding the Jefferson County case. Garcia paid Respondent $2,000.00.

Respondent's bank records reflect that on May 14, 2013, she deposited into her operating account $1,400.00 in cash paid by Garcia. Because Respondent's operating account contained insufficient funds when she made this deposit, she immediately converted a portion of Garcia's funds. By May 17, Respondent had spent and converted all of Garcia's funds.

Around May 20, 2013, Marin was able to bonded out of the ICE detention facility, and he was transferred to the Jefferson County Detention Facility. The immigration court scheduled a master calendar hearing the next day.

Marin's wife, Francheska Valdez, is a U.S. citizen. On May 2, 2013, she signed Form I-130 Petition for Alien Relative and gave it to Garcia. Garcia gave the form to Respondent. But Respondent never filed the form with USCIS. Rather, then she advised Garcia and Marin that they should wait to file the form and instead file an application for a work permit first. This advice was incorrect, however. Given Marin's circumstances, there was no basis to request employment authorization, since he was not a lawful permanent resident and had not filed an I-485 Application for Adjustment Status.

In late May 2013, Respondent met with Marin while he was incarcerated. She advised him that she would consult with his criminal attorney regarding the possible immigration implications of his criminal charges. On May 21, Respondent appeared in immigration court on Marin's behalf and entered her appearance. She explained to the court that Marin did not appear because he was detained in Jefferson County, and the court reset the master calendar hearing for June 25, 2013.

Sometime between May 21 and June 10, 2013, Marin was released from the Jefferson County detention center on bond. On June 10, 2013, Respondent attended a hearing in Marin's Jefferson County case. There, Marin entered pleas of not guilty to all pending charges, and Respondent spoke with Chowdhury about her plans to help Marin obtain a work permit, believing this might bolster Marin's request for probation.

On July 1, 2013, Garcia paid Respondent an additional $500.00, which Respondent deposited into her operating account. Again, this account was overdrawn. Thus, at the time of her deposit, Respondent immediately converted Garcia's funds. On July 3, the immigration court issued a "Notice of Hearing in Removal Proceedings" and set Marin's next master calendar hearing for October 29, 2013. The court also changed the venue of Marin's case to the immigration court in downtown Denver. The court's notice was mailed to Respondent at her business address.

Garcia and Marin met with Respondent in her office on July 12, 2013. On that day, Respondent knew she was closing her practice but did not inform them of this fact. On July 20, Garcia sent Respondent a money order for $380.00 for Marin's work permit application fee. Respondent never filed Marin's work permit application. Thereafter, Garcia discovered on Facebook that Respondent had closed her practice. Garcia tried to contact Respondent by telephone, email, and through Facebook, but with no success. Chowdhury also tried to contact Respondent by placing at least four telephone calls, but none of the telephone numbers Respondent had given her were in service.

On or about August 22, 2013, the Jefferson County District Attorney's volunteered to dismiss Marin's felony charges in exchange for a plea of guilty to a misdemeanor charge. Chowdhury wanted to discuss the potential immigration implications of the plea offer with Respondent but was unable to reach her. When Marin appeared in Jefferson County court on September 16, 2013, he was taken into custody by ICE.

On September 18, 2013, counsel for the Department of Homeland Security filed a motion to change the venue of Marin's case to Aurora, Colorado, given that Marin had been taken into custody at the GEO Detention Facility. The court granted this motion on September 24, 2013. Also on this day, the Aurora immigration court issued a "Notice of Hearing in Removal Proceedings" and set a master calendar hearing in Marin's case for

October 1, 2013. The court also issued a notice setting a custody redetermination hearing for October 1, 2013. Both of these notices were mailed to Respondent at her business address. They were returned to the immigration court on November 8, 2013, marked, "MOVED LEFT NO ADDRESS. UNABLE TO FORWARD. RETURN TO SENDER."

The immigration court issued another "Notice of Hearing in Removal Proceedings" on October 1, 2013, and moved Marin's hearing to October 8, 2013. A copy of this notice was mailed to Respondent at her registered business address. Marin appeared at the hearing on October 8, but Respondent did not appear. The court tried to call Respondent, but her telephone numbers were disconnected. The court continued the hearing until March 16, 2014, to permit Marin to hire a new lawyer. Marin submitted an "Application for Cancellation of Removal and Adjustment of Status" pro se on October 24, 2013. He then appeared by himself at the master calendar hearing on November 4, 2013. There, he testified that Respondent had taken his original border crossing card and never returned it nor had she returned any of his records from his criminal cases.

The court denied Marin's request for cancellation of removal and advised him that he could file the I–130 petition signed by his wife, which would qualify him for an immigrant visa and a possible adjustment of his status. The signed I–130 petition was in Respondent's possession, however, so Marin was unable to file it with the court. Marin, acting pro se, appealed the court's ruling denying his request for cancellation. His appeal was denied on February 7, 2014, and Marin was removed to Mexico. Respondent never returned Garcia's unearned fees.

 Through this conduct, Respondent violated ten Rules of Professional Conduct:

- Respondent violated Colo. RPC 1.1 when she failed to properly analyze Marin's immigration status and when she failed to make appropriate legal conclusions regarding the correct immigration forms to file on his behalf.

- Respondent contravened Colo. RPC 1.3 when she abandoned Marin's representation and neglected to properly consult with his public defender about the immigration implications of his criminal matter.

- Respondent violated Colo. RPC 1.4(a)(3) when she abandoned Marin and did not inform him about the status of his criminal and immigration matters after meeting with him on July 12, 2013.

- Respondent violated Colo. RPC 1.5(a) by collecting an unreasonable fee of $1400.00 for the limited legal services she provided Marin.

- Respondent violated Colo. RPC 1.5(b) by failing to provide Marin with a written statement of the work she was hired to perform or with an explanation of how her flat fee would be earned.

- By taking possession of the $1,400.00 Garcia paid on Marin's behalf and by consuming all of these fees, Respondent disregarded her obligations under Colo. RPC 1.5(f).

- Respondent violated Colo. RPC 1.15(a) when she deposited Garcia's funds into her operating account before she had earned them.

- Respondent violated Colo. RPC 1.15(b) by failing to return the unearned portion of Garcia's fee after she abandoned Marin's case, thereby terminating his representation.

- When Respondent did not return Marin's original documents after she had abandoned his case, Respondent violated Colo. RPC 1.16(d).

- Respondent violated Colo. RPC 8.4(c) by retaining the unearned fees Garcia paid and by knowingly converting those funds when she placed them into her operating account before she had earned them, ultimately consuming them for personal and business expenses.

## IV. SANCTIONS

 The American Bar Association *Standards for Imposing Lawyer Sanctions* (1991 & Supp.1992) ("ABA *Standards*") and Colorado Supreme Court case law guide the im-

position of sanctions for lawyer misconduct.[3] When imposing a sanction after a finding of lawyer misconduct, the Court must consider the duty violated, the lawyer's mental state, and the actual or potential injury caused by the lawyer's misconduct. These three variables yield a presumptive sanction that may be adjusted based on aggravating and mitigating factors.

### ABA *Standard* 3.0—Duty, Mental State, and Injury

*Duty:* During the course of her misconduct, Respondent violated numerous duties she owed to her clients, including failing to provide them with a written basis for her fee, neglecting to retain unearned client funds in her trust account, comingling client monies with her own, and keeping the unearned portions of her clients' advanced fees after the representation had been terminated. In violation of this same duty, she engaged in a pattern of neglect and abandonment of multiple clients, did not diligently pursue their cases or competently complete the work she was hired to perform, and failed to keep them reasonably informed about the status of their cases. She then proceeded to charge her clients unreasonable fees for unnecessary work and for services she failed to provide, thereby shirking the duties that she owed to both her clients and to the legal profession. Finally, she disregarded her obligations to her clients and to the public by engaging in dishonest conduct and by converting her clients' fees.

*Mental State:* The complaint explicitly establishes that Respondent knowingly failed to communicate with her clients about their cases and to perform the legal services for which she was hired. She also acted knowingly when she immediately deposited her clients' funds immediately into her operating account, consumed the funds for personal and business expenses, and then refused to return the unearned portion of her clients' fees once her representation was terminated.

The Court's order entering default, however, does not preclude a finding that Respondent acted not only knowingly but intentionally, and the Court does so here. Whereas knowledge is the conscious awareness of the nature of the conduct but without the conscious objective or purpose to accomplish a particular result, intent is defined as the conscious objective or purpose to accomplish a particular result.[4] The Court concludes that Respondent's abandonment of her clients' cases, coupled with her conversion of their funds was intentional because it was done with the conscious objective to deprive her clients of the fees they paid for her untendered services.

*Injury:* Respondent's misconduct undermined the public's perception of the legal profession and its trust and confidence in the legal system. Her conduct caused serious actual injury to her clients. In particular, Mr. Baker testified at the hearing that Respondent deprived him and his wife of their $2,500.00 flat fee, which they paid for her to file a U Visa on the Bakers' behalf, a task she never completed. Mr. Baker stated that he had to take out a loan for $2,500.00 to pay for Respondent's legal fees. Because Respondent failed to file the U Visa, Mr. Baker had to file the forms himself. He testified that it took him over three months to complete this task, since he was unable to use anything Respondent had completed. He had to start from the beginning, working on the weekends and late on evenings.

Padilla testified that Respondent's conduct caused her and her son serious harm. Padilla paid Respondent $5,000.00 for her to file for permanent residency status on behalf of both of them, which Respondent did not do. At the time Padilla hired Respondent, Mario was in high school and had a 3.7 GPA. Padilla testified that because of Respondent's failure to obtain permanent status for him, Mario lost his scholarship to college.

Respondent also caused Garcia and Marin serious injury. Garcia testified at the hearing that she paid Respondent a $2,500.00 flat fee to assist Marin with his immigration and criminal cases. Respondent did not complete the work they hired her to perform, and as a result, Marin was deported to Mexico. He is

---

**3.** *See In re Roose,* 69 P.3d 43, 46–47 (Colo.2003).

**4.** ABA *Standards* § IV, Definitions.

no longer able to see his son or return to the United States, and he will be prohibited from doing so for more than ten years. Respondent's actions shook Garcia's confidence in attorneys. After Respondent closed down her office without notifying Garcia or Marin, Garcia testified that she felt "blindsided" when she saw Respondent posting on her Facebook page and Twitter account that she had attended a concert and a baseball game. Garcia felt that Respondent was essentially "going on with her life" without even "a second thought about all of those people she had harmed."

### ABA *Standards* 4.0–7.0—Presumptive Sanction

Disbarment is the presumptive sanction for Respondent's misconduct in this case, as set forth in several ABA *Standards*. Respondent's violations of Colo. RPC 8.4(c) (dishonesty, fraud, deceit, or misrepresentation) and Colo. RPC 1.15(a)-(b) (client property) implicate ABA *Standard* 4.11.[5] That standard calls for disbarment when a lawyer knowingly converts client property and causes the client injury.

Similarly, ABA *Standard* 4.41 provides that disbarment is typically warranted when a lawyer causes serious or potentially serious injury to a client by knowingly failing to perform services for a client, engaging in a pattern of neglect with respect to client matters, or by abandoning the practice. ABA *Standard* 4.41 governs Respondent's violations of Colo. RPC 1.3 (diligence) and 1.4(a)(3) (status of the matter).

Disbarment is also the presumptive sanction under ABA *Standard* 7.1 when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession with the intent to obtain a benefit for the lawyer,

resulting in serious or potentially serious injury to the client, the public, or the legal system. That standard applies to Respondent's violations of Colo. RPC 1.5(a)-(b), and (f) (fees), as well as her violation of Colo. RPC 1.16(d) (protection of clients' interests).

The Court also takes into account that in cases involving multiple types of attorney misconduct, the ABA *Standards* recommend the ultimate sanction should be at least consistent with, and generally greater than, the sanction for the most serious disciplinary violation.[6]

### ABA *Standard* 9.0—Aggravating and Mitigating Factors

Aggravating circumstances include any considerations or factors that may justify an increase in the degree of the presumptive sanction to be imposed, while mitigating circumstances may warrant a reduction in the severity of the sanction.[7] The Court considers evidence of the following aggravating and mitigating circumstances in deciding the appropriate sanction. As noted above, the Court begins its analysis with disbarment as the presumptive sanction.

In this case, six aggravating factors are present. First, Respondent had a dishonest motive.[8] Second, Respondent engaged in a pattern of neglect and abandonment in three separate client matters.[9] Third, she violated numerous Colorado Rules of Professional Conduct.[10] Fourth, her refusal to participate in these proceedings, establishes her failure to acknowledge the wrongfulness of her conduct.[11] Fifth, the victims of her misconduct were vulnerable, unsophisticated clients who trusted Respondent to properly handle their immigration cases.[12] Sixth, Respondent's failure to repay her clients reflects an indif-

---

5. Although Appendix 1 of the ABA *Standards* indicates that the standards applicable to violations of Colo. RPC 8.4(c) are ABA *Standards* 4.6 and 5.1, the Court determines that ABA *Standard* 4.1, "Failure to Preserve the Client's Property," is more relevant to acts of conversion that violate Colo. RPC 8.4(c).

6. ABA *Standards* § II at 7.

7. *See* ABA *Standards* 9.21 & 9.31.

8. ABA *Standard* 9.22(b).

9. ABA *Standard* 9.22(c).

10. ABA *Standard* 9.22(d).

11. ABA Standard 9.22(g); *see People v. Williams*, 845 P.2d 1150, 1152 (Colo.1993) (finding that an attorney's disregard of the disciplinary proceedings is an aggravating factor).

12. ABA *Standard* 9.22(h).

ference to making restitution.[13] Because Respondent did not participate in the disciplinary proceeding, the Court is aware of just two mitigating factors, her lack of a prior disciplinary record and inexperience in the practice of law.[14] The Court, however, gives little weight to these factors in mitigation.[15]

### Analysis Under ABA *Standards* and Colorado Case Law

■ The Court is aware of the Colorado Supreme Court's directive to exercise discretion in imposing a sanction and to carefully apply aggravating and mitigating factors,[16] mindful that "individual circumstances make extremely problematic any meaningful comparison of discipline ultimately imposed in different cases." [17] Though prior cases are helpful by way of analogy, the Court is charged with determining the appropriate sanction for a lawyer's misconduct on a case-by-case basis.

■ Colorado case law identifies disbarment as the proper sanction when a lawyer knowingly converts client funds, absent significant mitigation.[18] Where a lawyer's conversion of client funds is coupled with abandonment of the client, it is all the more clear that disbarment is warranted, particularly when a lawyer knowingly disregards the en-

suing disciplinary proceeding.[19] Here, given the substantial number of aggravating factors and lack of meaningful mitigating factors, relevant Colorado Supreme Court case law, and Respondent's failure to participate in this proceeding, the presumptive sanction of disbarment is clearly warranted.

### V. CONCLUSION

Respondent violated her duties to her clients, to the public, and to the legal profession by neglecting and abandoning her clients' immigration cases and by knowingly converting their funds. Given that the presumptive sanction is disbarment and that the aggravating factors significantly outweigh the mitigating factors, Respondent must be disbarred.

### VI. ORDER

The Court therefore **ORDERS:**

1. **TAMIKA MONIQUE PALMER**, attorney registration number 42046, is **DISBARRED.** The **DISBARMENT SHALL** take effect only upon issuance of an "Order and Notice of Disbarment." [20]

2. Respondent **SHALL** promptly comply with C.R.C.P. 251.28(a)-(c), concerning

---

13. ABA *Standard* 9.22(j).

14. ABA *Standards* 9.32(a) & 9.32(f).

15. *See In re Discipline of Grimes*, 297 P.3d 564, 570 (Utah 2012), *reh'g denied* (Feb. 8, 2013), as amended (Mar. 21, 2013) ("While [Respondent's] inexperience may somewhat mitigate his lack of diligence, it does not take substantial experience in the practice of law to know that misappropriation is improper.... [W]e give the factor limited weight in misappropriation cases because the prohibition on misappropriation of client funds is fundamental to the practice of law. In short, we are not persuaded that Mr. Grimes's inexperience in the practice of law contributed to his misappropriation.").

16. *See In re Attorney F.*, 285 P.3d 322, 327 (Colo. 2012); *In re Fischer*, 89 P.3d 817, 822 (Colo. 2004) (finding that a hearing board had overemphasized the presumptive sanction and undervalued the importance of mitigating factors in determining the needs of the public).

17. *In re Attorney F.*, 285 P.3d at 327 (quoting *In re Rosen*, 198 P.3d 116, 121 (Colo.2008)).

18. *In re Haines*, 177 P.3d 1239, 1250 (Colo. 2008); *In re Cleland*, 2 P.3d 700, 703 (Colo. 2000).

19. *See In re Stevenson*, 979 P.2d 1043, 1045 (Colo.1999) (disbarring an attorney who abandoned his client, misappropriated funds, and failed to participate in the disciplinary proceeding); *People v. Kuntz*, 942 P.2d 1206, 1208 (Colo. 1997) (disbarring an attorney where the attorney accepted legal fees from several clients, performed little to no work on their cases, and abandoned the clients without returning their funds); *People v. Roybal*, 949 P.2d 993 (Colo. 1997) (disbarring attorney for abandoning clients, failing to return unearned fees, and engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).

20. In general, an order and notice of disbarment will issue thirty-five days after a decision is entered pursuant to C.R.C.P. 251.19(b) or (c). In some instances, the order and notice may issue later than thirty-five days by operation of C.R.C.P. 251.27(h), C.R.C.P. 59, or other applicable rules.

winding up of affairs, notice to parties in pending matters, and notice to parties in litigation.

3. Respondent also **SHALL** file with the Court, within fourteen days of issuance of the "Order and Notice of Disbarment," an affidavit complying with C.R.C.P. 251.28(d), requiring an attorney to file an affidavit with the Court setting forth pending matters and attesting, inter alia, to notification of clients and other jurisdictions where the attorney is licensed.

4. The parties **SHALL** file any post-hearing motion or application for stay pending appeal **on or before Thursday, April 16, 2015.** No extensions of time will be granted. Any response thereto **SHALL** be filed within seven days, unless otherwise ordered by the Court.

5. Respondent **SHALL** pay restitution to Ms. Baker, Ms. Padilla, and Ms. Garcia for all monies these individuals paid to Respondent, including attorney's fees and filing fees. Respondent **SHALL** also pay the costs of these proceedings. The People **SHALL** file a "Statement of Costs" and a "Statement of Restitution," **within fourteen days of the date of this order.** Any response thereto **SHALL** be filed within seven days, unless otherwise ordered by the PDJ.